PHILIP R. SELLINGER
United States Attorney
JOHN STINSON
HOPE Y. LU
Assistant U.S. Attorneys
401 Market Street, 4th Floor
Camden, NJ 08101
(856) 757-5139
john.stinson@usdoj.gov
hope.lu@usdoj.gov
*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| AIKIAM FLOYD,<br><br>       *Plaintiff,*<br><br>   v.<br><br>UNITED STATES OF AMERICA, *et al.,*<br><br>       *Defendants.* | Hon. Renée Marie Bumb, C.U.S.D.J.<br><br>Civil Action No. 22-cv-1229 (RMB)(SAK) |

## DEFENDANTS' BRIEF IN SUPPORT OF A MOTION TO DISMISS UNDER RULES 12(b)(1) AND 12(b)(6)

On the brief:
JOHN STINSON
HOPE LU

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................................................................................... 1

STATEMENT OF FACTS ............................................................................................ 2

I.     Plaintiff's Placement at FCI Fort Dix ............................................................. 2

   A.    BOP's Initial "Action Plan" to Combat COVID-19 ................................. 4

   B.    BOP's "Modified Operations Matrix" to Combat COVID-19 .................. 7

   C.    "Level 3 Operations" Under the "Matrix" at FCI Fort Dix ...................... 8

   D.    Isolation and Quarantine Protocols and Vaccines .................................. 10

   E.    BOP's Use of Home Confinement to Combat COVID-19 ...................... 12

   F.    COVID-19 Infections During the Subject Period and the Transfers to FCI Fort Dix from FCI Elkton .................................................................... 13

II.    Allegations in Plaintiff's Complaint .............................................................. 13

III.   Administrative Exhaustion Procedures .......................................................... 15

   A.    FTCA Exhaustion .................................................................................. 15

   B.    BOP's Administrative Remedy Program and Plaintiff's Submissions .......... 16

IV.    Procedural History of this Lawsuit ................................................................ 20

STANDARD OF REVIEW ........................................................................................ 21

I.     Rule 12(b)(1) .................................................................................................. 21

II.    Rule 12(b)(6) .................................................................................................. 22

LEGAL ARGUMENT ............................................................................................... 23

I.     THE COURT LACKS JURISDICTION OVER PLAINTIFF'S FTCA CLAIMS 23

   A.    Plaintiff Failed to Exhaust All of His Putative FTCA Claims ...................... 24

   B.    The Discretionary-Function Exception Bars Plaintiff's Claims ...................... 26

   C.    The FTCA Quarantine Exception Applies to Plaintiff's FTCA Claims .......... 34

II.    PLAINTIFF FAILED TO PLAUSIBLY ALLEGE CAUSATION ...................... 36

III.   PETITIONER ONLY EXHAUSTED ONE ADMINISTRATIVE REMEDY REQUEST, WHICH DOES NOT SUPPORT HIS *BIVENS* CLAIMS ...................... 38

IV.    A *BIVENS* REMEDY IS NOT AVAILABLE ................................................ 41

   A.    Plaintiff's Claims Are a New Bivens Context .............................................. 44

   B.    Alternate Processes Preclude the Creation of a Bivens Remedy .................... 48

   C.    Other Factors Counsel Against Implying a Bivens Remedy ......................... 50

V.   THE *BIVENS* DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.................................................................................. 53

   A.   Plaintiff Cannot State a Plausible Eighth Amendment Violation Against Defendants................................................................. 54

   B.   Plaintiff's Pandemic-Management Claims Do Not Allege the Violation of a Clearly Established Right.................................... 58

CONCLUSION............................................................................... 60

## PRELIMINARY STATEMENT

*Pro se* plaintiff Aikiam Floyd, a former inmate at the Federal Correctional Institution ("FCI") at Fort Dix, brings tort and constitutional claims regarding management of the COVID-19 pandemic and conditions at the facility by the Federal Bureau of Prison ("BOP"). Plaintiff alleges that the United States as well as former Warden David Ortiz, Clinical Director Dr. Nicoletta Turner-Foster, Assistant Health Services Administrator Jeffrey Wilk, Health Services Administrator Travis Haczynski, and Unit Manager Karlton Byrd[1] (collectively, the "Individual Defendants") failed to protect him from, and were deliberately indifferent to, the spread of COVID-19. Specifically, Plaintiff claims that BOP made minimal use of the Coronavirus Aid, Relief, and Economic Security ("CARES") Act during the pandemic; implemented practices that promoted, rather than reduced, the spread of COVID-19 infections; and failed to provide him and other inmates with proper medical care and safe living conditions. Plaintiff seeks money damages from the United States under the Federal Tort Claims Act ("FTCA") and from the Individual Defendants under *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). The Court should dismiss this action for multiple reasons.

First, the Court lacks subject-matter jurisdiction over Plaintiff's FTCA claims against the United States because: (1) he did not administratively exhaust most of them; (2) all of his FTCA claims are barred by the discretionary function exception;

---

[1] Plaintiff also named "CO Johnson" and "John and Jane Doe Fort Dix Staff," but the references are insufficient to identify such defendants.

and (3) many, if not all, of his claims are barred by the "quarantine exception" to the FTCA. Thus, the Court should dismiss the FTCA claims under Rule 12(b)(1) for lack of subject matter jurisdiction.

Second, Plaintiff failed to plausibly allege facts in his Complaint supporting causation between Defendants' alleged wrongful acts and his COVID-19 infection. Causation is required for all Plaintiff's claims against Defendants. Thus, the Court should dismiss the Complaint under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

Third, Plaintiff's Eighth Amendment claims against the Individual Defendants are fatally flawed in four respects: (1) Plaintiff failed to exhaust most of his Eighth Amendment claims, as required by the Prison Litigation Reform Act; (2) Supreme Court precedent bars recognizing the new *Bivens* remedies Plaintiff seeks; (3) Plaintiff failed to plausibly allege how each Individual Defendant violated his Eighth Amendment rights, instead merely recasting his tort claims as Eighth Amendment violations; and (4) the Individual Defendants are entitled to qualified immunity because there is no "clear established right" that any Individual Defendant violated. This Court should dismiss Plaintiff's Eighth Amendment claims under Rule 12(b)(6).

## STATEMENT OF FACTS

### I.    Plaintiff's Placement at FCI Fort Dix

FCI Fort Dix, a low security federal correctional institution with an adjacent minimum security satellite camp, "is the largest federal prison in the United States in terms of capacity, capable of housing up to 5,000 inmates," but it housed

approximately 2,900 inmates during the early stages of the pandemic. *See Wragg v. Ortiz*, 462 F. Supp. 3d 476, 484 (D.N.J. 2020) (discussing April-May 2020). "The majority of FCI Fort Dix's inmates reside in its low-security facility." *Id*. at 485. BOP placed Plaintiff at FCI Fort Dix pursuant to 18 U.S.C. § 3621(b), which grants BOP the discretion to "designate the place of the prisoner's imprisonment" after considering numerous factors, such as the nature of the offense, the characteristics of the inmate, and any statement by the court that imposed the sentence. *See* 18 U.S.C. § 3621(b)(1)-(5).

Plaintiff's placement at FCI Fort Dix was also governed by an individualized and fact-specific assessment called a "security designation and custody classification." BOP Program Statement No. 5100.08 at 1.[2] A custody classification is based on the "level of security and supervision the inmate requires," and the inmate's "program needs, i.e., substance abuse, educational/vocational training, individual counseling, group counseling, or medical/mental health treatment, etc." *Id*.

Plaintiff was serving a 121-month sentence at FCI Fort Dix and is now serving three years of supervised release for federal convictions for a drug trafficking conspiracy. *See United States v. Floyd*, Crim. Nos. 20-2147, 20-3651, 2021 U.S. App. LEXIS 33753, at *1 (2d Cir. Nov. 15, 2021). BOP released Plaintiff from custody on March 27, 2023. *See* Declaration of Corrie Dobovich ("Dobovich Decl."), Attach. A.

---

[2] https://www.bop.gov/policy/progstat/5100_008.pdf (last visited November 9, 2023).

## A.    BOP's Initial "Action Plan" to Combat COVID-19

Throughout the COVID-19 pandemic, to maintain the health and safety of inmates at FCI Fort Dix, BOP used infection prevention and mitigation strategies based on guidance from the Centers for Disease Control and Prevention ("CDC"), the Occupational Safety and Health Administration ("OSHA"), the Department of Justice ("DOJ"), and other relevant agencies and organizations. Declaration of Ashley Crisson ("Crisson Decl.") ¶ 9.[3] In the early days of the pandemic, this coordination resulted in a multi-phased operational plan called the "Action Plan," which then went through multiple iterations. *See* Crisson Decl. ¶ 5.[4] BOP designed its plans from available federal guidance in a way that incorporated flexibility and permitted each BOP facility to address the circumstances, conditions, limitations, and available resources at that particular facility. *Id.* ¶¶ 7-9. BOP manages 122 institutions across the United States.[5]

Under the Action Plan, BOP urged limited movement for inmates and very limited group gathering with a focus on maximizing social distancing for daily

---

[3] *See also BOP COVID-19 Action Plan* (Mar. 13, 2020) https://www.bop.gov/resources/news/20200313_covid-19.jsp (last visited November 9, 2023).

[4] The Crisson Declaration discusses Phase 9 of BOP's initial Action Plan, but press releases and records on earlier phases are publicly available on BOP's website. *See* https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp (Phase 5); https://www.bop.gov/resources/news/pdfs/20200414_press_release_action_plan_6.pdf (Phase 6); https://www.bop.gov/resources/news/20200520_covid-19_phase_seven.jsp (Phase 7); https://www.bop.gov/foia/docs//COVIDPhase8June30.pdf (Phase 8) (each webpage last visited November 9, 2023).

[5] *See About Our Facilities*, https://www.bop.gov/about/facilities/federal_prisons.jsp (last visited Nov. 9, 2023).

activities like commissary, laundry, showers, telephone, and computer access. Crisson Decl. ¶ 5.b. In April 2020, BOP provided all inmates and staff at FCI Fort Dix with surgical masks and later with three reusable cloth masks. Declaration of Dr. Nicoletta Turner Foster ("Turner-Foster Decl.") ¶ 32. BOP made inmate masking mandatory at FCI Fort Dix on April 16, 2020. *Id*. ¶ 31. BOP ensured that supplies of masks for inmates and staff at FCI Fort Dix were maintained and they remain "in ready supply[.]" *Id*. ¶ 33.

FCI Fort Dix ramped up its sanitation protocols based on guidance from BOP and the CDC. Declaration of Adam Sassaman ("Sassaman Decl.") ¶¶ 5-6. Detailed information on the development and implementation of COVID-19 sanitation guidelines at FCI Fort Dix during the relevant period can be found throughout the Sassaman Declaration, which also contains information on supplies of sanitary equipment and products available to staff and inmates at FCI Fort Dix during the subject period. Throughout the relevant period, "FCI Fort Dix has always maintained an adequate stock of sanitation supplies." Sassaman Decl. ¶ 34.

Regarding quarantining and isolation, "[e]very newly admitted inmate, including inmates transferring between BOP institutions," was "screened and tested for COVID-19 exposure and symptoms." Crisson Decl. ¶ 5c. Newly admitted inmates were then placed in quarantine and required to have a negative test prior to joining the general inmate population. *Id.* "Symptomatic or positive inmates were placed in isolation until they tested negative for COVID-19 or were cleared by medical staff as meeting CDC criteria for release from isolation." *Id.*

5

"In areas with sustained community transmission, such as FCI Fort Dix during the relevant period, and at medical centers, all staff were screened for symptoms before beginning work each day." *Id.* ¶ 5d. "Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone." *Id.* ¶ 5d. "If a staff member does not register a temperature but exhibits symptoms consistent with COVID-19, he/she is referred to one of the medical providers at the institution to assess suitability for work that day." *Id.*

BOP had testing guidance in place by June 2020 under the Action Plan. *See id.* ¶ 5.c and Attach. A. Testing resources were scarce in the United States in the early months of the pandemic. Turner-Foster Decl. ¶ 25. Nonetheless, at FCI Fort Dix, medical staff prioritized testing from the earliest days of the pandemic and developed improved procedures as the pandemic progressed and additional resources arrived in the United States. *Id.* ¶¶ 26-30. Thousands of inmates at FCI Fort Dix received COVID-19 testing during the first year of the pandemic; such testing included exposure quarantine testing of every general population housing unit. *Id.* ¶ 28-29.

Medical staff at FCI Fort Dix maintained medical services for inmates during the period at issue through modified processes that minimized potential exposure and spread. *Id.* ¶¶ 11-16. Outside medical services, particularly for emergent matters, were still available. *Id.* ¶¶ 14-16. However, the pandemic "had a profound impact on medical providers throughout New Jersey, making 'routine' medical care more scarce," which "affected the Health Services Department's ability to access outside services in 2020." *Id.* ¶ 16.

### B.    BOP's "Modified Operations Matrix" to Combat COVID-19

On August 16, 2021, BOP introduced the "Modified Operations Matrix" to further combat the spread of COVID-19. Crisson Decl. ¶ 6. This Matrix, incorporated parts of the Action Plan, such as quarantine and isolation protocols, while adding new health and safety measures and increasing BOP's flexibility to address institution-specific conditions, including at FCI Fort Dix. *See id.* ¶¶ 7-8. Like the Action Plan that preceded it, the "Modified Operations Matrix is an adjustable pandemic response plan for infection prevention procedures and inmate programming and services at any given BOP institution location." *Id.* ¶ 7.

The Modified Operation Matrix adjusts the infection prevention procedures at a particular institution based on three indicators of transmission risk: (1) the rate of COVID-19 inmates in medical isolation; (2) the combined percentage of staff and inmate who are vaccinated; and (3) the transmission rate of the county where the BOP institution is located. *Id.* These three indicators, in turn, dictate one of three modified levels of operation for the BOP institution. *Id.* The three levels of operation are reflected in part in the graphic below:

  

*See id.* ¶ 8 and Attach. E.[6]

"Level 1 Operations are for institutions with a low risk of transmission and involve minimal modifications." *Id.* ¶ 8. "Level 2 Operations are for institutions with an intermediate risk of transmission which directs a moderate amount of modifications to institution operations." *Id.* "Level 3 Operations are for institutions with a high level of transmission risk which directs a full pandemic response and mitigation measures involving intense modifications to institution operations." *Id.*

Under all three levels of the Modified Operations Matrix, medical isolation, contact tracing, and appropriate Personal Protective Equipment ("PPE") are required. *Id.* ¶ 10. Face coverings are mandated for staff members "while indoors regardless of vaccination status" and "continued high sanitation standards are expected at all levels of operation and at a minimum, all areas, supplies, and equipment must be cleaned on a daily basis." *Id.*

## C.    "Level 3 Operations" Under the "Matrix" at FCI Fort Dix

Implementation of Level 3 Operations at FCI Fort Dix in 2021 (which is beyond the time period of most of Plaintiff's allegations, but discussed here nonetheless) involved an extension of existing pandemic protocols under Phase 9 plus new protocols. Crisson Decl. ¶ 5a. During the first year of the pandemic, FCI Fort Dix operated in a manner that reflected the high community infection rates in New

---

[6] *See also BOP COVID-19 Operational Levels,*
https://www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp (last visited Nov. 11, 2023).

Jersey. *Id.* ¶ 5d (describing "sustained community transmission"). Under the "intense" modifications of Matrix Level 3, BOP personnel at FCI Fort Dix must:

➢ Follow the full COVID-19 Pandemic Plan including facility-wide use of face coverings, surgical or N95 masks as indicated for both inmates and staff.

➢ Conduct daily COVID-19 symptom screen and temperature check prior to entry into the institution (enhanced screening).

➢ Have social distancing in all areas of the facility and up to six feet where feasible.

➢ Utilize cohort systems, the practice of grouping individuals together to confine their care to one area and prevent contact with susceptible individuals, for inmate housing, inmate programming, and the provision of services.

*Id.* ¶ 14 and Attach. E. The "intense modifications" of Level 3 Operations are partially illustrated in the chart below:

| | Level 1 Operations ① | Level 2 Operations ② | Level 3 Operations ③ |
|---|---|---|---|
| Cohorting | Modifications not necessary | Modifications not necessary if social distancing is followed | Modifications necessary |
| Inmate Cloth Face Covering | Per DOJ guidance, face covering required at all times in all indoor environments | • Per DOJ guidance, face covering required at all times in all indoor environments<br>• Face covering required when social distancing is not possible outdoors | Follow the full COVID-19 Pandemic Plan including facility-wide use of face coverings, surgical or N95 masks as indicated. |
| Social Distancing | • All health care units and patient care areas<br>• Not necessary in other locations | All areas | All areas |
| Staff Cloth Face Covering | Per DOJ guidance, face covering required at all times in all indoor environments (surgical mask in patient care areas). | • Per DOJ guidance, face covering required at all times in all indoor environments (surgical mask in patient care areas).<br>• Face covering is required when social distancing is not possible outdoors. | Follow the full COVID-19 Pandemic Plan including facility-wide use of face coverings, surgical or N95 masks as indicated. |
| Staff Symptom Screening | Self monitoring/report symptoms of COVID-19 | Self monitoring/report symptoms of COVID-19 | Implement daily COVID-19 symptom screen and temp check prior to entry into the institution (enhanced screening) |

9

*See id.*, Attach. E.[7]

The Matrix urged social distancing in all areas of FCI Fort Dix during Phase 3 operations, even while acknowledging that six feet of distance is not always possible. The reduced inmate population at FCI Fort Dix promoted social distancing under Level 3 Operations, and "inmates generally moved throughout the facility in housing-unit assigned cohorts when required to leave their individual housing units for programming needs and to obtain services at that time." Crisson Decl. ¶ 16.

### D.    Isolation and Quarantine Protocols and Vaccines

Consistent with federal guidance, BOP established quarantine and isolation protocols for FCI Fort Dix at the outset of the COVID-19 pandemic. Turner-Foster Decl. ¶ 19 and Attach. A (BOP guidance). Inmates are "isolated" if they are "suspected (displaying symptoms) or confirmed (based on a positive point of care [POC] or commercial laboratory test) COVID-19 infection." *Id.*, Attach. B at 2. At FCI Fort Dix, "any time an inmate tested positive for COVID-19 in a housing unit, the positive inmate was placed in 'isolation' and the other inmates were housed in an 'exposure quarantine' cohort." *See id.* ¶ 20. For isolation, BOP places inmates in "single rooms or by cohorting them with other viral infection patients." *Id.*, Attach. B at 2.

BOP guidance directs testing of inmates into and out of quarantine—so no one is released from isolation until they clear a COVID-19 "send-out" laboratory test. *See id.* ¶¶ 25-30. By early 2021, "every general population housing unit at FCI Fort Dix

---

[7] *See also BOP COVID-19 Operational Levels*, https://www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp (last visited Nov. 13, 2023).

had been tested under exposure quarantine guidelines" and designated Intake or Transfer/Release quarantine units had been tested various times in keeping with the protocols governing transfers. *Id*. ¶ 29.

Inmates in isolation did not leave their housing units, and meals and other items were brought to such housing by staff. *Id*. ¶ 21. Any staff visiting a quarantine or isolation location were required to wear proper PPE. *Id*. ¶ 22. BOP staff conducted daily health assessments on inmates in isolation and exposure quarantine and provided medical care at FCI Fort Dix or at a community hospital as needed. *Id*. ¶ 24.

During the time alleged in the Complaint, inmates were moved into quarantine if they were asymptomatic and not fully vaccinated to "(1) observe them for symptoms and signs of the illness during the incubation period and (2) keep them apart from other incarcerated individuals." *Id*., Attach. A at 1. BOP utilizes three categories to determine whether quarantine is required for unvaccinated inmates: (1) an inmate exposed to COVID-19; (2) an inmate arriving at FCI Fort Dix, e.g., self-surrender; and (3) an inmate transferring to FCI Fort Dix from another institution. *See id*.; Crisson Decl. ¶¶ 17-19.

FCI Fort Dix has "designated quarantine and isolation locations throughout the institution." Crisson Decl. ¶ 17-19. Inmates being released or transferred were placed into cohorts and moved to quarantine spaces prior to their scheduled movement. *Id*. Similarly, BOP placed incoming transfers to FCI Fort Dix into cohorts and housed them in quarantine spaces subject to quarantine protocols. *Id*.

FCI Fort Dix received an initial shipment of mRNA vaccines on January 19, 2021, just weeks after emergency use authorization for them. Turner-Foster Decl. ¶ 34-37. FCI Fort Dix administered these vaccines pursuant to BOP clinical guidance and following a prioritization protocol. *Id.* ¶¶ 34-37, Attach. E. By March 25, 2021, BOP had offered all inmates at FCI Fort Dix an initial dose of an mRNA vaccine. *Id.* ¶ 37. This included the Plaintiff, who declined vaccination. *Id.* ¶ 44, Attach. G. To date, BOP has vaccinated thousands of inmates at FCI Fort Dix. Cresson Decl. ¶ 22.

## E.    BOP's Use of Home Confinement to Combat COVID-19

BOP also addressed the spread of COVID-19 by prioritizing home confinement under the CARES Act. Crisson Decl. ¶ 25. FCI Fort Dix considered the eligibility for home confinement of its entire inmate population prior to implementation of Phase 9 and ran eligibility rosters weekly, in an effort to determine if additional inmates become eligible. *Id.* ¶¶ 35-39. In making determinations for home confinement, BOP staff considered the totality of circumstances for each inmate based on a list of non-exhaustive factors set forth in the Attorney General's March 26, 2020 Memorandum regarding such home confinement.[8] In this guidance, the Attorney General urged BOP to consider each inmate's crime of conviction and the potential danger posed to the community, along with many other factors. Plaintiff received this individualized review. *Id.* ¶¶ 42-43.

---

[8] https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf (last visited Nov. 13, 2023).

**F.**    **COVID-19 Infections During the Subject Period and the Transfers to FCI Fort Dix from FCI Elkton**

FCI Fort Dix experienced COVID-19 infections among inmates and staff in the early months of the pandemic. Turner-Foster Decl. ¶ 38. The facility also experienced "a significant surge of COVID-19 infections in the fall of 2020." Id. ¶ 39.

BOP transferred FCI Elkton inmates to FCI Fort Dix in September and October 2020. Turner-Foster Decl. ¶ 40. BOP tested all FCI Elkton transfers and screened for COVID-19 upon arrival and then placed inmates in transfer quarantine or medical isolation in accordance with BOP protocols and guidance. *Id.* "If the [Elkton] inmate's COVID laboratory test was negative, he was placed in Unit 5703. If the inmate's test was positive, the inmate was placed in medical isolation for monitoring until cleared." *Id.*

As infection numbers at FCI Fort Dix increased in the fall of 2020, BOP staff sought a moratorium on transfers into the facility, as well as further limitations on movement within the facility. *See, e.g.,* Crisson Decl. ¶ 12, Attach. H. In an October 22, 2020 Memorandum, Warden Ortiz noted that this moratorium was necessary to preserve bed space for isolation and exposure quarantine. *Id.*

## II.    **Allegations in Plaintiff's Complaint**

On March 7, 2022, Plaintiff filed a complaint alleging intentional infliction of emotional distress, "deliberate indifference with negligence," negligence, and Eighth Amendment cruel and unusual punishment against BOP officials and staff. Plaintiff alleges BOP failed to prevent COVID-19 from spreading through "negligently transfer[ring] COVID-19 infected inmates from F.C.I. Elkton to F.C.I. Fort Dix,"

13

resulting in COVID-19 infection of Plaintiff and "more than half the inmate population." Compl., ECF No. 1, at 2. It appears that these allegations relate to Fall of 2020. Compl. at 8. Plaintiff also claims that BOP officials "failed to impose, enforce, and regulate policies in accordance [with recommendations from] the Center of Disease Control" and made "only limited use" of CARES Act home confinement during the pandemic. *Id.* at 2. Furthermore, Plaintiff alleges that the United States failed to provide adequate medical care at the facility. *Id.*

Specifically, Plaintiff alleges that, from March 2020 to February 2022, BOP staff used practices that "dehum[a]nized" him, including "pack[ing] living quarter[s] like sardines in a can," failing to address pest infestations, not providing a ventilation system or heat, and providing contaminated water and moldy food. *Id.* at 4. Plaintiff alleges that, after being hospitalized at some point, he was placed in a cell with no toilet or sink, heat, and inadequate sleeping arrangements. *Id.* He alleges he was provided a container in which to urinate and was ignored when the container was overflowing, and he was not permitted to shower despite having soiled himself. *Id.* at 5. Plaintiff claims he was denied medical care, even though he could not breathe. *Id.*

Plaintiff tested positive for COVID-19 on November 16, 2020, and also alleges that he "was infected with COVID-19 on numerous occasions" while in quarantine at different housing units. *Id.* at 10. Plaintiff further alleges that BOP provided inadequate and untimely medical care for a Helicobacter pylori (H. pylori) infection during pandemic isolation. *Id.* Additionally, Plaintiff alleges that the FCI Fort Dix housing units are old and poorly maintained, with paint chipping off the walls. *Id.*

14

Plaintiff seeks money damages and equitable relief, including an Order directing the United States remove purported lead pipes and lead paint and provide clean water. *Id.* at 11.

## III.    Administrative Exhaustion Procedures

In his Complaint, Plaintiff brings two categories of claims: (1) tort claims under the FTCA, 28 U.S.C. §§ 1346(b), 2671-2680; and (2) constitutional claims under *Bivens*. *See* Compl.; ECF No. 12. Plaintiff expressly alleges that he pursued administrative remedies before proceeding in this Court, and he attaches various records that purportedly demonstrate this. *See* Compl. at 10 ("Took multiple actions for Administrative Remedy between March 2020-2022") and "ATTACHMENT 2: Remedy Information."

BOP maintains records of inmate tort claims and administrative remedy requests concerning any conditions of confinement. Dobovich Decl. ¶ 4. FTCA exhaustion is governed by the FTCA and 28 C.F.R. §§ 14.1-14.11, 543.30-543.32. BOP's administrative remedy procedure is governed by 28 C.F.R. §§ 542.10-542.19 and is subject to the PLRA exhaustion requirement, 42 U.S.C. § 1997e.

### A.    FTCA Exhaustion

Under BOP regulations, an inmate must initiate a claim for property damage or personal injury by submitting the proper form "to the regional office in the region where the claim occurred." 28 C.F.R. § 543.31; *see* 28 U.S.C. § 2675(a). An inmate may only seek judicial review following receipt of a final dissatisfactory agency action. 28 U.S.C. § 2675(a) (mandating that judicial review is not available until the agency

denies the claim or six months pass from its receipt by the agency without a response); 28 C.F.R. § 543.32(g).

On January 12, 2021, BOP's Northeast Regional Office received Plaintiff's SF-95 tort claim, number TRT-NER-2021-03653, which was handwritten and dated January 6, 2021. Dobovich Decl. ¶ 7, Attach. E. Plaintiff's tort claim sought $12 million for BOP's alleged "deliberate[] indifference with negligence" causing him to contract COVID-19 in early November 2020, and resulting in "dizziness, chest pain, vomiting, fatigue and back pain, stomach pain, lost [sic] of taste, diarrhea, headaches," and emotional distress. *Id.*, Attach. E (SF-95 form with attachments). Plaintiff included an affidavit complaining about testing and housing protocols at FCI Fort Dix and alleged that BOP "failed to impose or enforce a policy, or regulation in accordance with [CDC] advisory guideline for social distance" and other CDC recommendations; under-used CARES Act home confinement to reduce populations; did not force staff to test for COVID-19; and did not perform "blood tests." *Id.*, Attach. E ("Affidavit of: Aikiam Floyd"). Plaintiff also appears to have attached various administrative remedy requests and other material to the SF-95. *Id.*, Attach. E.

BOP acknowledged receipt of Plaintiff's SF-95 tort claim on March 25, 2021 and denied the claim on November 15, 2021. *Id.*, Attach E.

**B.    BOP's Administrative Remedy Program and Plaintiff's Submissions**

BOP established an administrative remedy program where inmates may seek review of any complaint or grievance regarding any conditions of confinement or other aspects of the inmate's imprisonment. Dobovich Decl. ¶ 6; *see* 28 C.F.R. §§ 542.10-

542.19. BOP's Remedy Program consists of three levels of review. An inmate must first present his complaint to the Warden of the institution where he is confined on the proper BP-9 form within 20 days of the event giving rise to the grievance. 28 C.F.R. § 542.14. If the Warden's response to an inmate's BP-9 is unsatisfactory, the inmate may "submit an Appeal on the appropriate form (BP-10) to the appropriate Regional Director within 20 calendar days of the date the Warden signed the response." 28 C.F.R. § 542.15(a). At the final level of administrative review, if an inmate remains unsatisfied with the Regional Director's response to his first appeal, he may "submit an Appeal on the appropriate form (BP-11) to the General Counsel within 30 calendar days of the date the Regional Director signed the response." *Id*. No administrative grievance is fully exhausted for purposes of the Prison Litigation Reform Act, 42 U.S.C. § 1997e, until the Central Office denies the third and final appeal. Dobovich Decl. ¶ 6; *see Trotman v. Smith*, 796 F. App'x 764, 765-66 (3d Cir. 2020) (discussing three levels of BOP grievance system).

Prior to his March 2023 release, Plaintiff had submitted nine administrative remedy requests while incarcerated at FCI Fort Dix. Dobovich Decl. ¶ 5, Attach. C. However, he only exhausted one of these requests by appealing it through the full required process. *Id*. ¶ 6 (discussing Administrative Remedy Case No. 1058864), Attachs. C, D. The other remedy requests remain unexhausted. *Id*. ¶ 6, Attach. C.

In the one exhausted request, No. 1058864, initiated November 30, 2020, Plaintiff complains that he was infected with COVID-19 in Housing Unit 5812, where "I have been quarantined since March of 2020." Dobovich Decl., Attach. D (see blue

form bearing "Case Number 1058864-F2" with continuation page). Plaintiff complained that he contracted COVID-19 because BOP failed to compel staff to test for COVID-19; implemented negligent staff screening protocols; and failed to follow CDC guidance regarding COVID-19. Plaintiff accused "the FCI Fort Dix administration" of "reckless disregard for [Plaintiff's] health" and "knowingly" endangering his life. *Id*. He alleged that defendants Byrd and Wilk ignored his request "to be removed from the population [of Unit 5812] to protect myself" from infection and took no action "to isolate me from potentially sick and contagious inmates and/or staff." *Id*. He alleged that "Fort Dix administration" also moved "inmates previously-exposed to the COVID-positive inmates into rooms that had NOT contained any COVID-positive inmates." *Id*. These actions and others like them allegedly caused Plaintiff to contract COVID-19, which he found out from a positive test in November 2020. *Id*. It is not clear from his remedy request to the Warden what relief Plaintiff sought. *Id*.

The Warden denied Request No. 1058864 on December 17, 2020, finding as follows:

> A review of your medical record reveals on October 20, 2020, you were placed in exposure quarantine after potentially being exposed to COVID-19. While in quarantine, on November 2, 2020, you tested positive and were placed on isolation. You remained in isolation following the guidance from the Centers for Disease Control and Prevention (CDC) for a period of time until you were no longer considered contagious with the COVID-19 virus.
>
> FCI Fort Dix continues to follow the guidance from the CDC along with the recommendations from Central Office regarding isolation and quarantine procedures. Staff screen [sic] and testing procedures for the COVID-19 virus are also conducted following the CDC recommendations. There is no evidence indicating staff

> at FCI Fort Dix endangered your life or contributed to your exposure which you contracted the COVID-19 virus. Accordingly, your request is denied.

Dobovich Decl., Attach. D.

On January 5, 2021, Plaintiff appealed the Warden's denial of Request No. 1058864 to the Regional Office. *Id*. (see yellow form with continuation page). Plaintiff again complained about "inadequate" staff screening procedures and what he believed to be his "deliberate" exposure to COVID-19 infected inmates and staff. *Id*. He asserted that such pandemic management was negligent and constituted reckless disregard for his health. *Id*. He complained of a new outbreak of COVID-19 infections and argued that it demonstrated "that Ft. Dix does not have the capability to protect my health and safety." *Id*.

The Northeast Regional Office denied the appeal of Request No. 1058864 on June 18, 2021, finding as follows:

> [BOP] has worked closely with the National Institutes of Health (NIH) and Centers for Disease Control (CDC) to develop and implement the best management practices for COVID-19 in correctional environments. These practices have effectively reduce and mitigate [sic] the transmission of COVID-19.
>
> A review of your appeal reveals the Warden addressed your concerns. FCI Fort Dix has effectively implemented the BOP COVID-19 modified operations to mitigate the transmission of COVID-19 and protect staff and inmates. . . .

Dobovich Decl., Attach. D ("Appeal No. 1058864-R1").

On October 18, 2021, Plaintiff appealed the Northeast Regional Office's denial of Request No. 1058864 to the Central Office. *Id*. (see pink form with continuation page). In this final appeal, Plaintiff stated that the "warden has not address [sic] my

concern" and "BOP continue to highlight poor executed plan that staff is not following, ignoring the CDC, practices that endangered my well being and the well being of others, which infected more than half the prison population with covid-19 virus[.]" *Id*. Plaintiff reiterated his complaints about staff screening without mandatory testing. He also stated that BOP was not timely responding to his complaints. *Id*. He concluded the appeal by stating that "I'm requesting that another Agency who overlooks the behavior of the administration review my merits on the claim, and a settlement of $127,000 for injury be dispensed." *Id*.

On February 2, 2022, the Central Office denied Plaintiff's final appeal. *Id*. ("Administrative Remedy No. 1058864-A3"). The Central Office concurred "with the manner in which the Warden and Regional Director responded to [Plaintiff's] concerns at the time of your Request for Administrative Remedy and subsequent appeal." *Id*. The Central Office also notified Plaintiff that BOP's administrative remedy program does not provide monetary relief. *Id*.

## IV.    Procedural History of this Lawsuit

Plaintiff filed this action on March 22, 2022. ECF No. 1. On April 27, 2022, the Court granted Plaintiff leave to proceed *in forma pauperis*, but withheld service of process pending screening pursuant to 28 U.S.C. §§ 1915, 1915A. ECF No. 6.

On December 16, 2022, the Court directed that service could proceed on Plaintiff's FTCA claims against the United States and his *Bivens* claims against the Individual Defendants. ECF No. 12. Service then followed, except with respect to "CO Johnson" and the Doe defendants.

## STANDARD OF REVIEW

### I.    Rule 12(b)(1)

Defendants are bringing a factual attack to jurisdiction. A motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1) "attacks the right of a plaintiff to be heard in Federal Court." *Doughty v. United States Postal Serv.*, 359 F. Supp. 2d 361, 364 (D.N.J. 2005) (quoting *Cohen v. Kurtzman*, 45 F. Supp. 2d 423, 428 (D.N.J. 1999)). The court may dismiss for lack of subject-matter jurisdiction at any time regardless of whether an answer to the complaint has been filed or the parties have conducted discovery. *CNA v. United States*, 535 F.3d 132, 145-46 (3d Cir. 2008). The burden is on a plaintiff to establish the Court's jurisdiction. *Lightfoot v. United States*, 564 F.3d 625, 627 (3d Cir. 2009).

"Challenges to subject matter jurisdiction under Rule 12(b)(1) may be facial or factual." *Common Cause of Pa. v. Pennsylvania*, 558 F.3d 249, 257 (3d Cir. 2009) (internal citation and quotation omitted). In considering a factual challenge to subject-matter jurisdiction, which the United States brings below, the Court is not bound by the allegations in the complaint and "may consider evidence outside the pleadings." *United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242, 251 (3d Cir. 2016). Furthermore, "[t]he presumption of truth does not extend to" a factual attack on jurisdiction "'and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.'" *Courts v. United States*, No. 15-7303 (MLC), 2016 U.S. Dist. LEXIS 115268, at *7 (D.N.J. Aug. 29, 2016) (quoting *Mortensen v. First Fed. Sav. &*

*Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). The Court may dismiss a complaint based on a factual challenge "at any time." *See* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."); *see also Berardi v. Swanson Mem'l Lodge No. 48*, 920 F.2d 198, 200 (3d Cir. 1990) ("[T]he Supreme Court made clear that a facially sufficient complaint may be dismissed before an answer is served if it can be shown by affidavits that subject matter jurisdiction is lacking.") (Alito, J.).

## II.    Rule 12(b)(6)

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). A complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 663 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). The Court need not consider "legal conclusions" contained within a complaint, and "a pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Id.* at 678.

In conducting this plausibility analysis, the Court is not limited to the allegations in the complaint. The Court may take judicial notice of documents and records that are not reasonably subject to dispute, such as "documents that are

explicitly relied upon in" (or integral to) the complaint, "even if the plaintiff fails to attach the document." *Perez v. Turner*, No. 11-6833 (RBK), 2013 U.S. Dist. LEXIS 88892, at *19 n.5 (D.N.J. June 25, 2013) (citing *Lum v. Bank of Am.*, 361 F.3d 217, 222 n.3 (3d Cir. 2004)).

Further, a "document integral to or explicitly relied on in the complaint may be considered 'without converting the motion [to dismiss] into one for summary judgment.'" *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 529 (D.N.J. 2004) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)) (some internal quotations omitted); *see also Spencer v. City of Phila.*, No. 09-123, 2012 U.S. Dist. LEXIS 45831, at *6 (W.D. Pa. Apr. 2, 2012) (citing *Pryor v. Nat'l Collegiate Athletic Assoc.*, 288 F.3d 548, 560 (3d Cir. 2002)) (observing that such documents "do[] not convert Defendants' motion to dismiss for failure to state a claim into a motion for summary judgment").

## LEGAL ARGUMENT

## I.  THE COURT LACKS JURISDICTION OVER PLAINTIFF'S FTCA CLAIMS

Plaintiff's tort claims against the United States should be dismissed for lack of subject-matter jurisdiction for any of three independent reasons. First, Plaintiff failed to exhaust his administrative remedies under the FTCA as to many of his putative tort claims in his Complaint. Second, all of Plaintiff's claims are subject to the discretionary-function exception to the FTCA. Third, the "quarantine exception" to the FTCA applies to some, if not all, of Plaintiff's claims.

## A.     Plaintiff Failed to Exhaust All of His Putative FTCA Claims

Plaintiff's Complaint alleges a host of tort claims for negligence and "intentional infliction of emotional distress." Compl. at 1. However, Plaintiff is limited to the claims set forth in his SF-95 claim form and no jurisdiction exists for this Court to consider any later-added claims.

"The FTCA operates as a limited waiver of the United States'[] sovereign immunity." *White-Squire v. United States Postal Serv.*, 592 F.3d 453, 456 (3d Cir. 2010) (citing *Roma v. United States*, 344 F.3d 352, 362 (3d Cir. 2003)). "Because the [FTCA] constitutes a waiver of sovereign immunity, the Act's established procedures have been strictly construed.'" *Id.* (quoting *Livera v. First Nat'l State Bank of N.J.*, 879 F.2d 1186, 1194 (3d Cir. 1989)). Courts "'should not take it upon [them]selves to extend the waiver beyond that which Congress intended.'" *Id.* (quoting *United States v. Kubrick*, 444 U.S. 111, 117-18 (1979)).

Under the FTCA, prior to commencing an action in court, a plaintiff "shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail. The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section." 28 U.S.C. § 2675(a). "The statute requires 'complete exhaustion' of administrative remedies before a claimant can seek relief in court." *Ahmed v. United States*, 334 F. App'x 512, 513 (3d Cir. 2009) (citing *McNeil v. United States*, 508 U.S. 106, 112 (1993)).

As a result of the above limitations on the FTCA's waiver of sovereign immunity, where a plaintiff tries to add new or expanded claims that were not previously exhausted administratively, federal courts dismiss or deny such additional tort claims. *See, e.g., Brooks v. Bledsoe*, 682 F. App'x 164, 167-68 (3d Cir. 2017) (affirming dismissal of additional claims that did not appear in an administrative tort claim form); *Govan v. United States*, Civ. No. 09-00491 (RBK), 2009 WL 10664447, at *3 (D.N.J. Nov. 6, 2009) (denying a motion to amend a complaint to add unexhausted tort claims).

Here, BOP received Plaintiff's SF-95 tort claim form demanding $12 million on January 12, 2021. Dobovich Decl., Attach. E (SF-95 form with attachments). In it, Plaintiff alleged that "deliberate[] indifference with negligence" by BOP staff caused him to contract COVID-19 in early November 2020, which resulted in "dizziness, chest pain, vomiting, fatigue and back pain, stomach pain, lost [sic] of taste, diarrhea, headaches," and emotional distress. *Id.* In his SF-95, Plaintiff complained about testing and housing unit protocols at FCI Fort Dix and alleged that BOP "failed to impose or enforce a policy, or regulation in accordance with [CDC] advisory guideline for social distance" and other CDC recommendations; under-used CARES Act home confinement to reduce populations; did not force staff to test for COVID-19; and did not perform "blood tests." *Id.*, Attach. E ("Affidavit of: Aikiam Floyd"). There is no explanation of what kind of "blood test" might be called for or why.

Accordingly, Plaintiff's tort claims here are limited to his allegations that BOP's negligence and indifference regarding staff screening, inmate testing, inmate

housing protocols, implementation of CDC recommendations, and use of home confinement resulted in him contracting COVID-19. His claim for "intentional infliction of emotional distress" is unexhausted, as are the allegations in his Complaint regarding the following:

- The United States was negligent by transferring inmates from FCI Elkton to FCI Fort Dix.

- The United States deliberately or negligently failed to provide adequate medical care at FCI Fort Dix.

- The United States deliberately or negligently ran overcrowded housing, failed to address pest infestations, failed to provide ventilation and/or heat, and provided contaminated water and/or improper food.

- The United States deliberately or negligently placed Plaintiff in a cell/room without adequate toileting facilities while he was ill with either COVID-19 or H. Pylori.

- The United States negligently maintained housing facilities with peeling paint, lead paint, and/or lead pipes.

*See* Compl. at 2, 4-7, 10-11. Thus, the Court should dismiss Plaintiff's unexhausted tort claims for lack of subject matter jurisdiction.

### B.    The Discretionary-Function Exception Bars Plaintiff's Claims

Whether exhausted or not, Plaintiff's FTCA claims are barred discretionary-function exception to the FTCA. Under this exception, the FTCA "shall not apply to— (a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency

or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

The discretionary function exception "marks the boundary between Congress's willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. S.A. Empresa de Viacao Aereo Rio Gradense (Varig Airlines)*, 467 U.S. 797, 808 (1984). Congress also sought to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort . . . ." *United States v. Gaubert*, 499 U.S. 315, 323 (1991) (internal quotations omitted).

Courts employ a two-part test to determine whether challenged conduct falls within this exception. "First, a court must determine whether the act involves an 'element of judgment or choice.'" *Mitchell v. United States*, 225 F.3d 361, 364 (3d Cir. 2000) (quoting *Gaubert*, 499 U.S. at 322). Second, if the challenged conduct does involve judgment or choice, a court must determine "'whether that judgment is of the kind that the discretionary function exception was designed to shield.'" *Id.* at 363 (quoting *Gaubert*, 499 U.S. at 322–23).

"The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by the statute, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Id.* (internal quotations omitted). In this regard, "[w]here there is room for policy judgment and decision there is discretion." *U.S. Fid. & Guar. Co. v. United States*, 837 F.2d 116, 120 (3d Cir. 1988).

Regarding prison administration, BOP is "accorded wide ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *See Whitley v. Albers*, 475 U.S. 312, 321, 322 (1986). This "wide ranging" discretion applies to BOP's allocation of medical care,[9] the placement of inmates infected with a disease,[10] the decision to transfer inmates,[11] and prison lockdowns.[12] And it "unquestionably" extends to management of the COVID-19 pandemic. *See Santiago v. United States*, Civ. No. 7:21-00436, 2022 WL 790805, at *3 (W.D. Va. Mar. 14, 2022), *app. dismissed*, No. 22-6416, 2022 WL 9721500 (4th Cir. July 8, 2022), and *aff'd*, No. 22-6416, 2023 WL 2610240 (4th Cir. Mar. 23, 2023). This is because "BOP

---

[9] *See Lipsey v. United States*, 879 F.3d 249, 255 (7th Cir. 2018) (considerations of availability of medical care when making prisoner placement decisions are susceptible to policy analysis); *Cosby v. U.S. Marshals Serv.*, 520 F. App'x 819, 821 (11th Cir. 2013) (decisions regarding what care to make available at a particular facility involves "several policy considerations . . . including prison security, the allocation of finite resources, and the logistics of prisoner transportation if transfer to an off-site facility is an option").

[10] *See Ruiz v. United States*, 664 F. App'x 130, 133 (3d Cir. 2016) (affirming application of the discretionary function exception to allegation that BOP assigned the prisoner plaintiff an HIV-positive cellmate).

[11] *See Willis v. Lappin*, No. 09-cv-01703, 2012 U.S. Dist. LEXIS 149639, *39-40 (E.D. Cal. Oct. 17, 2012) (transfer decision related to safety concerns subject to discretionary-function exception because transfer "policy clearly allows the officers discretion in their decisions, by its language 'allows staff to exercise their professional judgment'"), *R&R adopted*, 2013 U.S. Dist. LEXIS 38106 (E.D. Cal. Mar. 19, 2013).

[12] *See Dugan v. Warden, FCC Coleman-USP I*, 673 F. App'x 940, 943 (11th Cir. 2016) ("[I]n the case of a prison lockdown, prison staff must necessarily balance competing policy concerns, including inmate and staff safety, efficient supervision of inmates, and allocation of resources. Because the nature of the complained-of conduct is "susceptible to policy analysis," it satisfies the criteria of the discretionary function exception.").

must balance its duty to protect inmates from COVID-19 with its duty to protect inmates from each other, to safeguard staff, and to protect the public." *Id.*

Accordingly, several courts have held that FTCA claims concerning BOP's implementation of COVID-19 protocols are subject to the discretionary-function exception to the FTCA. *See Busara v. United States*, Civ. No. 2:21-4055, 2023 WL 4946460, at *7-8 (W.D. La. Apr. 27, 2023), *R&R adopted*, Civ. No. 2:21-04055, 2023 WL 4938479 (W.D. La. Aug. 2, 2023); *Brown v. United States*, Civ. No. 1:22-00404, 2023 WL 2632811, at *11-12 (M.D. Pa. Mar. 24, 2023); *Swinton v. United States*, No. 21-cv-11, 2022 U.S. Dist. LEXIS 60084, at *17-18 (W.D. Pa. Mar. 31, 2022) ("Under the discretionary function exception, [the plaintiff-inmate] cannot sue the United States for money damages based on any alleged inadequacy of the Bureau of Prisons' response to Covid-19.") (R&R); *Sanford v. Dobbs*, No. 21-2552, 2022 U.S. Dist. LEXIS 74720, at *7-8 (D.S.C. Apr. 25, 2022). *But see Thieme v. United States*, Civ. No. 21-682 (RMB-AMD), 2023 WL 2584102, at *8 (D.N.J. Mar. 21, 2023) ("the Court must reserve its decision on the application of the discretionary function exception for further briefing"); *Stegemann v. United States*, Civ. No. 21-00949, 2023 WL 2643504, at *3-4 (N.D.N.Y. Mar. 27, 2023).

Plaintiff's broad-brush allegations reinforce the notion that the discretionary function exception bars his claims, *i.e.*: (1) adoption of recommendations from the CDC for managing COVID-19; (2) use of CARES Act home confinement to reduce inmate populations; (3) decisions about transferring inmates from FCI Elkton to FCI Fort Dix; (4) decisions about housing and movement of inmates within FCI Fort Dix,

including the provision of isolation and quarantine spaces; (5) testing protocols for inmates; (6) screening protocols for staff entering FCI Fort Dix; and (7) the general provision of medical care at FCI Fort Dix during the COVID-19 pandemic, whether for inmates infected with COVID-19 or conditions such as an H. pylori infection.

The discretionary function exception to FTCA jurisdiction bars these claims because each of these conduct areas involves choice and discretion for BOP employees and constitutes the kind of policy-based decision-making that the discretionary function exception was designed to shield from liability. The fact is that BOP officials inside and outside of FCI Fort Dix had to weigh and balance different policy factors during uniquely difficult times in the early months of a global pandemic. They made decisions based on guidance and developing knowledge about the COVID-19 virus, within a framework of limited resources—not firm and clear mandates issued by agency leadership and intended to apply to all BOP facilities, no matter the immediate circumstances. There was no established blueprint for how to use BOP's limited resources in addressing a host of first-of-their-kind issues while at the same time balancing inmate welfare and public safety.

Specially, the CDC's pandemic guidance for correctional facilities is not, and never was, mandatory. *See* Sassaman Decl., Attach. 2. Similarly, as shown in the various attachments to the BOP declarations, BOP COVID-19 policies provide guidance and best practices and contain very few specific, bright-line mandates (and almost none that are not subject to exceptions and medical judgment). *See generally* Crisson Decl., Turner-Foster Decl., Sassaman Decl. The burden here is on Plaintiff to

point to a specific, mandatory policy that BOP breached. *See Thieme*, 2023 WL 2584102 at *7. Absent that, the discretionary-function exception should apply. *Busara*, 2023 WL 4946460 at *7.

Further, as noted in *Thieme*, this Court already determined that the use of home confinement through the CARES Act is a discretionary decision based on individualized review of each inmate. *See* 2023 WL 2584102, at *7. Nothing in his Complaint urges a different outcome on this issue here. *See also Sanford*, 2022 WL 1210717, at *3 (discretionary function exception applied because home confinement under the CARES Act leaves "that decision to the BOP's discretion").

Similarly, the transfers of inmates from FCI Elkton to FCI Fort Dix reflects BOP's discretion, even if Plaintiff believes BOP such transfers were negligent. "BOP's actions in transferring, classifying, and placing prisoners in particular institutions are acts that come within the discretionary function exception[.]" *Atkins v. United States*, No. 19-1622, 2020 U.S. Dist. LEXIS 2874, at *13 (M.D. Pa. Jan. 7, 2020). Because of a federal court's order to reduce the population at FCI Elkton,[13] BOP officials had to determine how to comply with the order while considering how it would affect BOP's other 121 facilities, *see* BOP Program Statement No. 5100.08,[14] as well as considerations unique to the COVID-19 pandemic. There is no mandatory rule for where these Elkton inmates should have gone.

---

[13] *See generally Wilson v. Williams*, 455 F. Supp. 3d 467 (N.D. Ohio), *enforcement granted*, No. 4:20-CV-00794, 2020 WL 2542131 (N.D. Ohio May 19, 2020), *vacated and remanded*, No. 20-3547, 2020 WL 9813537 (6th Cir. Sept. 17, 2020), and *vacated*, 961 F.3d 829 (6th Cir. 2020).

[14] https://www.bop.gov/policy/progstat/5100_008.pdf (last visited Nov. 13, 2023).

The same can be said of BOP's internal placement and movement of inmates within FCI Fort Dix. Courts have recognized for years that inmate housing and movement within a facility is committed to BOP's discretion. *Mitchell v. United States*, 149 F. Supp. 2d 1111, 1114 (D. Ariz. 1999) ("[T]actical choices made surrounding the movement of inmates within the institutions are judgment calls and choices based on policy determinations that seek to accommodate safety goals and the reality of finite agency resources.") (cleaned up). Plaintiff can point to no specific BOP mandate or policy requiring certain housing decisions. BOP pandemic guidance provides best practices, not bright line rules, about housing and inmate movement. Such guidance also acknowledges that each BOP facility and the circumstances of any given moment are unique and may require flexibility. *See* Cresson Decl., Attachs. A, E-F. For example, BOP's quarantine guidance contains certain requirements, while building in flexibility to implement isolation and quarantine in ways that work for the particular facility and its inmate population and directing medical professionals to exercise medical judgment. *See* Turner-Foster Decl. at Attach. A (recommending, *inter alia*, that quarantining "should be" used in certain circumstances and then immediately providing exceptions).

Likewise, testing protocols for inmates at FCI Fort Dix were subject to substantial discretion. Testing protocols at FCI Fort Dix followed BOP guidance, which was based upon CDC guidance and the availability of test kits and supplies. *See* Turner-Foster Decl. ¶¶ 25-30. As Dr. Turner-Foster notes, testing supplies were scarce for many months during the start of the pandemic, and BOP had to make

decisions about how to prioritize limited resources and evaluate in real time the usefulness of developing testing technology. *Id*.

BOP conducted workplace screening of its employees based on the same kinds of discretionary considerations. *Id*. ¶¶ 8-9. BOP had to keep FCI Fort Dix properly staffed while also seeking to protect employees and inmates from infection and not depleting scarce testing resources. *See id*. ¶¶ 8-9; Crisson Decl. ¶ 5, Attach. A. There was no mandatory testing policy for BOP staff and no authority required one.

The overall management and provision of medical care at FCI Fort Dix had to change rapidly in uncertain circumstances and then adjust as knowledge about the COVID-19 virus developed. As the United States Court of Appeals for the Third Circuit has noted in the detainee context, "COVID-19 presents highly unusual and unique circumstances that have radically transformed our everyday lives in ways previously inconceivable and have altered our world with lightning speed and unprecedented results." *Hope v. Warden York Cty. Prison*, 972 F.3d 310, 330 (3d Cir. 2020). And as Dr. Turner-Foster stated, in the face of these challenges, her team also faced limitations in resources for use at FCI Fort Dix and in access to outside medical care. *See* Turner-Foster Decl. ¶¶ 11-24; *see also Corral v. United States*, Civ. No. 12-6220 (JBS), 2013 WL 4540919, at *4 (D.N.J. Aug. 27, 2013) (holding that where policy considerations affect the overall provision of medical care at a BOP facility, the discretionary function exception will apply). All these decisions—about COVID-19 testing, staff screening, and the provision of medical care and screening during a time of worldwide crisis and resource challenges—constitute discretionary conduct of the

type the discretionary-function exception was designed to protect.

Finally, because Plaintiff fails to plead any kind of plausible constitutional violation by any Defendant (see Parts III and V(A) *infra*), the discretionary-function exception applies here. While the Third Circuit has held that "the discretionary exception does not apply to conduct that violates the Constitution[,]" *Xi v. Haugen*, 68 F.4th 824, 839 (3d Cir. 2023), Plaintiff cannot overcome the lack of jurisdiction here merely by re-labeling his FTCA claims as Eight Amendment violations. This Court in *Thieme* "reserve[d] its decision on the application of the discretionary function exception for further briefing" on constitutional issues, 2023 WL 2584102, at *8, but that is unnecessary here where Plaintiff's Eighth Amendment claims lack plausibility and should be dismissed as addressed below.

Absent Plaintiff pointing to a specific, mandatory policy that the United States breached, which then caused him to contract COVID-19—not one of which is recounted anywhere in his Complaint—the discretionary-function exception applies to all Plaintiff's FTCA claims. Thus, the Court should dismiss Plaintiff's FTCA claims for lack of subject matter jurisdiction.

## C. The FTCA Quarantine Exception Applies to Plaintiff's FTCA Claims

Several federal courts have held that the "quarantine exception" to the FTCA applied or could apply to BOP's pandemic management, and thus eliminate jurisdiction for FTCA claims. *See Brown v. United States*, Civ. No. 3:22-124, 2023 WL 5167251, at *13 (N.D.W. Va. Apr. 28, 2023) ("imposition of a quarantine is expressly listed in 28 U.S.C. § 2680(f) as an area where the Government maintains its sovereign

immunity"), *R & R adopted*, Civ. No. 3:22-124, 2023 WL 4744597 (N.D. W. Va. July 25, 2023); *Bell v. United States*, Civ. No. 3:21-148, 2023 WL 2730660, at *7 (N.D. W. Va. Mar. 31, 2023) (observing that, if raised correctly, the quarantine exception would apply to pandemic-era FTCA claims); *Wallace v. U.S. DOJ*, Civ. No. 21-3035-D, 2021 WL 2853692, at *2 (E.D.N.C. June 24, 2021), *aff'd*, No. 21-7017, 2022 WL 1024613 (4th Cir. Apr. 6, 2022). For example, in *Thieme*, the United States raised the quarantine exception as grounds to dismiss those plaintiffs' FTCA claims, and this Court held that the exception could apply to allegations that a plaintiff was "harmed by [the United States'] acts in carrying out a quarantine; for example, that they were harmed by the quarantine lock-down conditions imposed on them" but could not apply to an "alleged failure to impose stricter quarantine protocols to prevent [plaintiffs] from becoming infected with COVID-19." 2023 WL 2584102, at *10.

Here, Plaintiff alleges that he was harmed by the housing BOP provided during the pandemic, which he claims was unventilated, pest-ridden, in disrepair, and lacking in adequate toileting and shower facilities. Compl. at 4-5, 10-11. He similarly alleges that BOP's pandemic protocols at FCI Fort Dix resulted in him eating poor food and drinking unclean water in such housing. *Id*. Under the *Thieme* formulation of the FTCA quarantine exception, Plaintiff's claims are barred.

Defendants also assert that the quarantine exception should apply to Plaintiff's pandemic-management claims—because, to date, the Third Circuit has not foreclosed this argument, but Defendants acknowledge the Court limited the scope of the quarantine exception in *Thieme* to apply to only some of Plaintiff's claims. Thus,

the Court should dismiss all or some of Plaintiff's FTCA claims based on the quarantine exception.

## II.  PLAINTIFF FAILED TO PLAUSIBLY ALLEGE CAUSATION

Plaintiff alleges in both his FTCA and *Bivens* claims that negligence or deliberate indifference by the Defendants resulted in him contracting COVID-19. However, Plaintiff fails to state a claim because he does not plead a plausible causal connection between his alleged injuries and the purported wrongdoing of any Defendant. Plaintiff's claims rely entirely on guesswork and speculation —which is not enough to survive a motion to dismiss under Rule 12(b)(6).

To survive a motion to dismiss an FTCA claim, the plaintiff must have alleged "sufficient facts from which this Court can infer the negligence elements of duty, breach, causation, and damages." *Gambino v. Cassano*, Civ. No. 17-0830-NLH, 2021 WL 1186794, at *9 (D.N.J. Mar. 30, 2021). An Eighth Amendment conditions of confinement claim requires a plaintiff to plead plausibly that "(1) he was incarcerated under conditions imposing a substantial risk of serious harm, (2) the defendant-official was deliberately indifferent to that substantial risk to his health and safety, and (3) the defendant-official's deliberate indifference caused him harm." *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2015).

Several federal courts have dismissed similar "pandemic mismanagement" lawsuits for failure to state a claim where the complaint failed to include plausible causation allegations. *See, e.g., Walker v. United States et al.*, Civ. No. 3:21-cv-1881, 2022 WL 1472872, at *3, *5 (M.D. Pa. May 10, 2022) (dismissing FTCA claims for

insufficient pleading regarding causation and declining to permit constitutional liability without allegations of personal involvement in an action that caused the purported harm); *Eads v. United States et al.*, Civ. No. 1:21-17369-NLH, 1:21-cv-17369-NLH, at *4 (D.N.J. Sep. 27, 2023) (denying preliminary relief and an opportunity to amend); *Johnson v. Allison*, Civ. No. 21-2348, 2023 WL 4551838, at *4 (E.D. Cal. July 14, 2023), *R & R adopted,* Civ. No. 21-2348, 2023 WL 5651778 (E.D. Cal. Aug. 31, 2023) (dismissing constitutional claims for, *inter alia*, insufficient pleading on causation); *Hill v. Page*, Civ. No. 21-0046, 2021 WL 2677359, at *3 (E.D. Ark. June 8, 2021), *R & R adopted*, Civ. No. 21-0046, 2021 WL 2666851 (E.D. Ark. June 29, 2021), *aff'd*, No. 21-2782, 2021 WL 6808426 (8th Cir. Dec. 23, 2021) ("Plaintiff's belief that he contracted Covid-19 almost three weeks after Defendant Creasey alleged violated safety precautions, on November 14 and 18, is simply too speculative to sustain an Eighth Amendment violation."); *McGee v. Pontow*, Civ. No. 21-1184-BHL, 2023 WL 2072094, at *6 (E.D. Wis. Feb. 17, 2023), *aff'd,* No. 23-1487, 2023 WL 7381450 (7th Cir. Nov. 8, 2023) (finding no plausible causation based on alleged defendant wrongdoing and noting that when "the virus eventually arrived at the institution, it spread rapidly").

Here, Plaintiff speculates about various possible causes for his infection, but he does not plausibly allege that any particular acts or omissions by the United States or any Individual Defendant caused his November 2020 COVID-19 infection. Likewise, his SF-95 only points to BOP's failure to follow CDC guidance, maximize home confinement, and force staff to obtain COVID tests or undergo other screening.

Remedy No. 1058864 added to this list only that Wilks and Byrd declined to move Plaintiff to another housing unit when he requested it. Plaintiff does not plead any factual connection between these alleged wrongdoings and his infection. Like the plaintiffs in the cases cited above, Plaintiff is just speculating that one, several, or all these alleged wrongs resulted in him contracting COVID-19. Thus, the Court should dismiss Plaintiff's Complaint for failure to state a claim under Rule 12(b)(6).

## III.    PETITIONER ONLY EXHAUSTED ONE ADMINISTRATIVE REMEDY REQUEST, WHICH DOES NOT SUPPORT HIS *BIVENS* CLAIMS

Plaintiff asserted in his Complaint that he "took multiple action for Administrative Remedy between March 2020-2022 which in most cases were denied while at FCI Fort Dix." Compl. at 10. He also attached various grievance records. Compl., "Attachment 2: Remedy Information." Thus, the issue of exhaustion is intrinsic to the Complaint, *see In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d at 529, and, as set for the below, the Court should dismiss Plaintiff's *Bivens* claims for failure to exhaust administrative remedies.

Plaintiff only exhausted one of his administrative remedy requests, Request No. 1058864. Dobovich Decl. ¶¶ 5-6; Attach. D. As shown in his original grievance, Plaintiff complained that he was infected with COVID-19 in Housing Unit 5812, where "I have been quarantined since March of 2020." *Id.* (blue form bearing "Case Number 1058864-F2" with continuation page). His complaints, largely about the "Fort Dix administration" generally, resemble those in his SF-95 tort claim; that is, BOP failed to compel staff to test for COVID-19, implemented negligent staff screening protocols, failed to follow CDC guidance regarding COVID-19, and moved

inmates internally within FCI Fort Dix in ways that spread infections. *Id.* The only exception to this broad-brush style of pleading is Plaintiff's allegation that defendants Byrd and Wilk ignored his request "to be removed from the population [of Unit 5812] to protect myself" from infection and took no action "to isolate me from potentially sick and contagious inmates and/or staff." *Id.*

Under the PLRA, an inmate challenging the conditions of his confinement must exhaust all available administrative remedies. *See* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). The PLRA requires "complete" exhaustion of a claim at the administrative level. This means an inmate must not only initiate an administrative grievance; the inmate must also appeal any denial of relief through all available levels comprising the administrative process. "Exhaustion is mandatory; an inmate's unexhausted claim cannot be raised in a *Bivens* action." *Candido v. Hogsten*, 316 F. App'x 128, 129 (3d Cir. 2008) (citing *Jones v. Bock,* 549 U.S. 199 (2007)); *see White v. McGinnis*, 131 F.3d 593, 595 (6th Cir. 1997) (affirming dismissal where "plaintiff filed a Step I administrative grievance regarding his claims, but did not pursue appeal"). "'An inmate may not raise in an Appeal issues not raised in the lower level filings.'" *Bailey-El v. Fed. Bureau of Prisons*, 246 F. App'x 105, 107-08 (3d Cir. 2007) (quoting 28 C.F.R. § 542.15(b)(2)).

This mandatory exhaustion requirement applies to all suits regarding prison life, including concerns over COVID-19. *See Dimartino v. Sage*, Civ. No. 21-498, 2022 U.S. Dist. LEXIS 6639, at *14 (D. Conn. Jan. 13, 2022) ("[T]he Court concludes that this § 2241 petition [seeking home confinement and challenging conditions of confinement] is subject to the requirements and limitations set forth in the PLRA."); *Alvarez v. Larose*, 445 F. Supp. 3d 861, 866 (S.D. Cal. 2020) (applying PLRA "to a habeas claim based on confinement conditions" based on COVID-19).

Unlike prudential exhaustion, there are no exceptions to this statutory PLRA exhaustion requirement. *See Ross v. Blake*, 578 U.S. 632, 639 (2016) ("[T]hat mandatory language means a court may not excuse a failure to exhaust, even to take such circumstances into account"); *see also Nyhuis v. Reno*, 204 F.3d 65, 71 (3d Cir. 2000) ("[W]e are of the opinion that § 1997e(a), as amended by the PLRA, ***completely precludes a futility exception*** to its mandatory exhaustion requirement." (emphasis added)). In fact, the only so-called "exception" to the exhaustion requirement is when the administrative remedy process is "unavailable." *Ross*, , 578 U.S. at 641.

Courts in this District have determined that an inmate's administrative submissions must be sufficiently detailed so as to "alert[] the prison to the nature of the wrong for which redress is sought." *Id.* (citing *Olivares v. United States*, No. 07-3476 (JBS/AMD), 2010 U.S. Dist. LEXIS 133577, *12-13 (D.N.J. Dec. 16, 2010)), *aff'd*, 447 F. App'x 347 (3d Cir. 2011)). In applying this standard, courts should generally

look at the "focus" of the inmate's requested remedy. *See Olivares*, 447 F. App'x at 351-52 (citing *Spruill v. Gillis*, 372 F.3d 218, 222 (3d Cir. 2004)).

"PLRA exhaustion is a question of law to be determined by a judge." *Stile v. United States*, No. 16-3832 (RMB), 2018 U.S. Dist. LEXIS 48889, *7 (D.N.J. Mar. 15, 2018) (citing *Shumanis v. Lehigh Cnty.*, 675 F. App'x 145, 147 (3d Cir. 2017)). "'[J]udges may resolve factual disputes relevant to the exhaustion issue without the participation of a jury.'" *Id.* (quoting *Small v. Camden Cnty.*, 728 F.3d 265, 271 (3d Cir. 2013)); *Spruill*, 372 F.3d at 223 (courts can consider failure to exhaust under § 1997e where "the exhaustion issue turns on the indisputably authentic documents").

Plaintiff alleges constitutional "conditions of confinement and denial of medical care claims" against Individual Defendants Ortiz, Turner-Foster, Wilks, Haczynski, and Byrd. ECF Nos. 1, 12. But his one exhausted grievance, Request No. 1058864, contains only the same accusations of negligence pleaded in his FTCA claim. There are no allegations of any denial of care—much less deliberate indifference to a serious medical need. Defendants Byrd and Wilk are the only individuals named in Request No. 1058864, and even then, for declining to move Plaintiff to another housing unit at his request and not for anything concerning alleged deliberate indifference. Thus, the Court should dismiss Plaintiff's *Bivens* claims against all Individual Defendants.

## IV.    A *BIVENS* REMEDY IS NOT AVAILABLE

The Court should also dismiss Plaintiff's *Bivens* claims because no remedy exists for Plaintiff. Consistent with the Supreme Court's decision in *Abbasi* and its

recent decision in *Egbert*, this Court should not imply a *Bivens* remedy for Plaintiff's deliberate indifference claims against the Individual Defendants in the new context of the COVID-19 pandemic.

The Supreme Court "has made clear" that not every constitutional violation alleged against a federal officer gives rise to an implied damages action and "expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017). The high court has recognized a *Bivens* remedy only three times: (1) *Bivens*, itself, a 1971 case involving allegations that federal narcotics agents entered the claimant's apartment without a warrant, searched his home, and arrested him on narcotics charges, all without probable cause; (2) *Davis v. Passman*, 442 U.S. 228 (1979), which inferred a damages remedy under the Fifth Amendment for a congressional staff member to sue a Congressman for gender discrimination; and (3) *Carlson v. Green*, 446 U.S. 14 (1980), which inferred a damages remedy under the Eighth Amendment against federal prison officials for failure to provide emergency medical care to treat an inmate's severe, life-threatening asthma. *Abbasi*, 137 S. Ct. at 1854-55. "These three cases—*Bivens, Davis, and Carlson*—represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself." *Id.* at 1855. The Supreme Court's decision in "*Abbasi* reflected a 'notable change' in the Supreme Court's attitude toward creating an implied damages remedy directly from the Constitution." *Mack v. Yost*, 968 F.3d 311, 317 (3d Cir. 2020).

Since *Abbasi*, the Supreme Court has further restricted courts from expanding *Bivens*. In 2022, the Supreme Court stated in *Egbert v. Boule* that "creating a cause of action is a legislative endeavor," "the Judiciary's authority" to create a *Bivens* remedy is "at best, uncertain," and if it "were called to decide *Bivens* today, [it] would decline to discover any implied causes of action in the Constitution." 142 S. Ct. 1793, 1802-1803, 1809 (2022) (citation omitted). However, "rather than dispense with *Bivens* altogether," the Court in *Egbert* retained the familiar analytic two-step framework set forth in *Abbasi*: first, courts must ask whether the case presents "a new *Bivens* context" and, if so, whether there are "'special factors' indicating that the Judiciary is *at least arguably* less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed.'" *Id.* at 1803 (emphasis added). The Court reiterated: "in all but the most unusual circumstances, prescribing a cause of action is a job for Congress, not the courts[.]" *Id.* at 1800.

If "[a] case is different in a meaningful way from previous *Bivens* cases decided by this Court, then the context is new." *Abbasi*, 137 S. Ct. at 1859. This "new-context inquiry is easily satisfied," and "even a modest extension is still an extension." *Id.* at 1864, 1866. Some "examples of new contexts" include, but are not limited to, "a case that involves a 'new category of defendants,'" *Egbert*, 142 S. Ct. at 1803, "the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; [and] the risk of disruptive intrusion by the

Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider." *Abbasi*, 137 S. Ct. at 1860. "Unless the Supreme Court has recognized the context before, the context is 'new' and a special factors inquiry is required to determine if *Bivens* expansion is appropriate." *Mack*, 968 F.3d at 319.

If the case presents a new context, courts must then consider "whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Abbasi*, 137 S. Ct. at 1857-58. Courts must "evaluate *any* grounds that counsel against *Bivens* relief," regardless of when – or even if – the argument is raised. *Egbert*, 142 S. Ct. at 1806, n. 3 (emphasis added). Courts have a "concomitant responsibility" to do so because "recognizing a *Bivens* cause of action is an extraordinary act that places great stress on the separation of powers." *Id.* The two steps "often resolve to a single question: whether there is *any* reason to think that Congress might be better equipped to create a damages remedy." *Id.* at 1803 (emphasis added). This is not a high bar: "If there is even a single reason to pause before applying *Bivens* in a new context, a court may not recognize a *Bivens* remedy." *Id.* Such is the case here, for all the Individual Defendants.

### A.    Plaintiff's Claims Are a New Bivens Context

Plaintiff's constitutional claims here regarding pandemic management, COVID-related conditions of confinement, and inadequate COVID-related medical care all constitute a new context. They are not like any of the three recognized *Bivens* contexts, including *Carlson*. In *Carlson*, the plaintiff brought an Eighth Amendment

claim against federal officials who failed to provide any medical treatment for a known and acute asthmatic condition, resulting in the death of an inmate. *Carlson* is meaningfully different for several reasons.

First, the Supreme Court has not extended *Bivens* to claims against federal prison officials regarding conditions of confinement. *See, e.g.*, *Mammana v. Barben*, 856 F. App'x 411, 414-15 (3d Cir. 2021) (rejecting the argument that *Carlson* gives footing to an Eighth Amendment conditions-of-confinement claim against federal officials); *see also Walker v. United States*, No. 21-1881, 2022 WL 1472872, at *4 (M.D. Pa. May 10, 2022); *Hill v. Lappin*, 561 F. Supp. 3d 481, 487 (M.D. Pa. 2021) ("As the dust settles . . . and courts begin to appreciate *Abbasi*'s watershed scope, the better-reasoned authority has declined to recognized a *Bivens* remedy for Eighth Amendment conditions of confinement . . . claims.").

Second, it is not enough that Plaintiff's claims and *Carlson* both involve the Eighth Amendment. "A claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized" and to argue otherwise is to demonstrate "a basic misunderstanding of what our cases mean by a new context." *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020). To illustrate, in *Abbasi*, foreign detainees, held on immigration violations in the wake of the September 11, 2001, terrorist attacks, brought a putative class action against federal officials, alleging that the harsh conditions of confinement imposed on detainees violated the Fifth and Eighth Amendments. Although the *Abbasi* Court noted the existence of "significant parallels" between the case before it

and *Carlson*, the Court ultimately determined that the detainees' claims of mistreatment while detained sought to extend *Carlson*'s claims of prisoner mistreatment to a new context, reasoning that "even a modest extension is still an extension." *See id.* at 1860-65.

Third, Plaintiff's claims bear little resemblance to the facts in *Carlson*. *See Green v. Carlson*, 581 F.2d 669, 670-71 (7th Cir. 1978), *aff'd,* 446 U.S. 14 (1980) (setting forth factual background). In *Carlson*, the plaintiff suffered "extreme" deviations from the medical standard of care in the treatment of his asthma. *See Scott v. Quay*, No. 19-1075, 2020 WL 8611292, at *5-6 (E.D.N.Y. Nov. 16, 2020) (discussing *Carlson*, 446 U.S. at 16 n.1). In contrast, Plaintiff's claims are based on conditions experienced by all FCI Fort Dix inmates at the beginning of an unprecedented, global pandemic and decisions BOP made regarding the provision of medical services during uncertain times with limited resources.

As this Court previously concluded in a related case involving similar allegations, "[t]his case presents a meaningfully different fact pattern than *Carlson* because the prison officials here were responding to a global pandemic of a new, little known virus that required them to prioritize the medical needs of the entire prison population within the resources they had." *Thieme*, 2023 WL 2584102, at *13 (finding a new context and declining to imply a damages remedy). Similarly, Plaintiff's claim of failure to receive medical attention for his H. Pylori infection during the early months of the COVID-19 pandemic does not allege any "life-threatening need for immediate medical care that prison officials knew could not be provided within FCI

Fort Dix[.]" *Id.* at *13. That claim also presents a new context.[15]

Not surprisingly, therefore, courts have declined to recognize a *Bivens* remedy for Eighth Amendment claims arising from the COVID-19 pandemic. *See Thieme, supra*; *Walker*, 2022 WL 1472872, at *5 (declining to extend *Bivens* to an inmate's claim that BOP exhibited deliberate indifference towards his conditions of confinement, causing the spread of COVID-19 in violation of the Eighth Amendment); *Blanding v. Fed. Bureau of Prisons*, No. 21-1115, 2021 WL 5139912, at *7 (E.D. Pa. Nov. 4, 2021) (reasoning that the court cannot recognize a *Bivens* remedy for an Eighth Amendment conditions of confinement claim against federal prison officials for their alleged failure to implement appropriate procedures to mitigate the spread of COVID-19 during an inmate's incarceration); *Stone v. Wilson*, Civ. No. 20-0406, 2021 WL 2936055, at *6 (N.D. Tex. July 13, 2021) (finding no *Bivens* remedy for inmate's Eighth Amendment conditions of confinement claim arising from allegations of inadequate staffing, overcrowding, inadequate social distancing, lack of adequate sanitation, lack of adequate PPE, and failure to properly respond to the COVID-19 pandemic); *Blakely v. Pistro*, Civ. No. 21-572, 2021 WL 2312647, at *1-3 (E.D. Pa. June 27, 2021) (declining to extend *Bivens* to an Eighth Amendment claim arising

---

[15] In addition, as discussed below, the special factor considerations associated with policies and procedures implemented by BOP across all facilities to combat an unprecedented global health crisis differ in a meaningful way from the specific failure of prison officials to treat an inmate's known and medically-treatable condition, as in *Carlson*. *See Abbasi*, 137 S. Ct. at 1860 (identifying "the generality or specificity of the official action" and "the presence of potential special factors that previous *Bivens* cases did not consider" as ways in which a case might differ meaningfully from other *Bivens* cases).

from an inmate's cell conditions, his contracting COVID-19, and the lockdown). Thus, Plaintiff's pandemic-management claims present a new context and special factors and alternative remedies caution against recognizing a *Bivens* remedy.

### B.   Alternate Processes Preclude the Creation of a Bivens Remedy

A *Bivens* remedy should not be extended to this new context because there are alternative processes capable of protecting the interests at stake. Upon determining that a *Bivens* claim arises in a new context, the next question the Court must ask is "whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Vanderklok v. United States*, 868 F.3d 189, 200 (3d Cir. 2017) (cleaned up). As the Supreme Court explained in *Abbasi*, "when alternative methods of relief are available, a *Bivens* remedy usually is not." *Abbasi*, 137 S. Ct. at 1863; *see Egbert*, 142 S. Ct. at 1806 (the ability to submit a grievance through a process created by Congress or the Executive with a sufficient level of deterrence should not be second-guessed by the courts superimposing a *Bivens* remedy).

Moreover, that alternative remedy "need not provide an individual with ***complete*** relief in order to foreclose a damages remedy under *Bivens*." *Mack v. Yost*, 968 F.3d 311, 320 (3d Cir. 2020) (emphasis in original). And it need not afford an individual the rights to participation or appeal. *See Egbert*, 142 S. Ct. at 1806. "The court must ask only whether it, rather than the political branches, is better equipped to decide whether existing remedies should be augmented by the creation of a new judicial remedy." *See id.* at 1804 (internal quotation marks omitted).

Plaintiff had recourse to BOP's administrative grievance program for each of

the issues about which he now complains. As Plaintiff himself admits, he began the process for many of his complaints regarding FCI Fort Dix, but he did not appear to continue through all of his appeals except for Remedy No. 1058864. BOP's administrative grievance process provided Plaintiff with an opportunity for relief at the administrative level, which conserves judicial resources, and a chance to correct any errors in its own decision-making, which fosters administrative autonomy. *See, e.g., Nyhuis v. Reno*, 204 F.3d 65, 68-69 (3d Cir. 2000); *see also Silva*, 2022 WL 3023684, at *4 ("'[B]ecause *Bivens* is concerned solely with deterring the unconstitutional acts of individual officers,' we find the availability of the BOP's Administrative Remedy Program offers an independently sufficient ground to foreclose Plaintiff's *Bivens* claim." (quoting *Egbert*, 142 S. Ct. at 1806)). In *Thieme*, this Court found BOP's remedy program to constitute another avenue to relief that precluded a *Bivens* remedy. 2023 WL 2584102, at *14.

Plaintiff also had other alternative remedies available to him. He could have sought equitable or injunctive relief from this Court, moved for compassionate release based on his conditions of confinement during the pandemic, or pursued a damages remedy against the United States under the FTCA (an alternative remedy that Plaintiff is already pursuing in this case). *See, e.g., Abbasi*, 137 S. Ct. at 1862-63, 1865 (identifying injunctive relief as an alternative process); *Mack*, 968 F.3d at 321 (declining to extend *Bivens* to inmate's claims, in part, because alternative processes such as the BOP's administrative remedy process and injunctive relief in federal court could have redressed plaintiff's alleged harms); *Vega v. United States*, 881 F.3d 1146,

1154 & n.4 (9th Cir. 2018) (finding no *Bivens* remedy for inmate, in part, because BOP's Administrative Remedy Program "provide[d] an adequate, and more appropriate, remedy to vindicate [his] rights"); *Blanding*, 2021 WL 5139912, at *6 (recognizing the FTCA, the writ of habeas corpus, and motions for compassionate release as alternative remedies that incarcerated persons may use to seek release or redress based on conditions of confinement during the pandemic); *see also Egbert*, 142 S. Ct. at 1802 (noting that the plaintiff engaged in the Border Patrol's administrative tort claim process under the FTCA to redress his alleged harm); *Silva v. Ward*, No. 16-185, 2019 WL 4721052, at *5 (W.D. Wis. Sept. 26, 2019) (reasoning that an inmate is "not entitled to the remedy of his choice, even if he considers it to be inferior" because the "alternative procedure inquiry does not ask whether the remedy available to the plaintiff offers complete relief" but rather whether the inmate has "another alternative process available to him"). Thus, alternative processes preclude the creation of a *Bivens* remedy.

### C. Other Factors Counsel Against Implying a Bivens Remedy

The Court should consider other special factors counselling against a *Bivens* remedy here. They include separation-of-powers, congressional action, and the potentially enormous social costs in extending *Bivens* to Eighth Amendment claims based on pandemic management and protocols. As the Supreme Court emphasized in *Egbert*, the only question a court must ask is "whether it, rather than the political branches, is better equipped to decide whether existing remedies should be augmented by the creation of a new judicial remedy." *Id.* (internal quotation marks omitted). And the answer to that question in "most every case," as it is here, is that

"no *Bivens* action may lie." *See id.* at 1803.

The Third Circuit has already held that judicial intervention in BOP's administrative decisions would improperly encroach upon the executive's domain. *See Mack*, 968 F.3d at 322-23; *Alexander v. Ortiz*, No. 15-6981, 2018 WL 1399302, at *7-8 (D.N.J. Mar. 20, 2018), *aff'd*, 807 F. App'x 198 (3d Cir. 2018). The recognition of a *Bivens* remedy in this case would do the same. As *Egbert* counsels, the Court should seek to avoid questioning, in hindsight, the decision-making of BOP in the midst of a rapidly changing and unprecedented public health emergency, especially when BOP, and by extension the Executive branch, have already created an alternative remedial structure to address the concerns of the federal inmate population, including those concerns arising from the COVID-19 pandemic. 142 S. Ct. at 1805 ("The *Bivens* inquiry does not invite federal courts to independently assess the costs and benefits of implying a cause of action.").

An additional special factor that the Court should consider is Congress's choice not to provide a damages remedy when it has otherwise considered and regulated in the COVID-19 arena. *See Abbasi*, 137 S. Ct. at 1862. Congress is aware of the issue at the core of this lawsuit—the spread of COVID-19—and its legislative response to the pandemic has been vast and far-reaching. *See Melendez v. City of New York*, 16 F.4th 992, 998 (2d Cir. 2021) (cataloging the expenditures and payments made by the federal government in response to the pandemic); *see also* CARES Act, Pub. L. No. 116-136, 134 Stat. 281 (2020) (providing multiple kinds of relief or protection for individuals effected by quarantines). Despite this legislative response, Congress has

chosen not to provide a statutory damages remedy against federal officials overseeing prisons for their response to the COVID-19 pandemic. This silence counsels strongly against "judicial usurpation of the legislative function" in this context. *See De La Paz v. Coy*, 786 F.3d 367, 377 (5th Cir. 2015). This is particularly true where the targets for the damages remedy are individual federal employees.

Further discouraging the extension of *Bivens* to this context are the "potentially enormous" social costs that "agency liability would entail" in litigating *Bivens* claims based on pandemic management and protocols. *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001) (citation omitted). As the *Egbert* Court recently reiterated, "[r]ecognizing any new *Bivens* action, entail[s] substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." 142 S. Ct. at 1807 (internal quotation marks omitted). Allowing inmates to raise *Bivens* causes of action premised on the BOP's COVID-19 response poses an acute risk of increasing these costs and imposing a significant burden on the Government. *Abbasi*, 137 S. Ct. at 1856 ("Claims against federal officials often create substantial costs, in the form of defense and indemnification."). The social costs or, rather, the harmful consequences associated with creating a *Bivens* remedy for inmates whose preferred COVID-19 pandemic policies were not instituted by BOP during this unprecedented, global health crisis is "rational" reason enough for this Court to decline a *Bivens* remedy and dismiss Plaintiff's pandemic-management claims. *Egbert*, 142 S. Ct. at 1805.

The special factors at issue here are more than enough to give pause. "Even in a particular case, a court likely cannot predict the systemwide consequences of recognizing a cause of action under *Bivens*." *Id*. at 1804 (internal quotation marks omitted). And it is that uncertainty "alone" which "forecloses relief." *Id*. The Court should, therefore, decline to extend a *Bivens* remedy to Plaintiff's pandemic-management claims and dismiss them. [16]

## V.    THE *BIVENS* DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

Even if this Court extends a *Bivens* remedy in this case, then the Court should still dismiss the *Bivens* claims based on qualified immunity. "In the limited settings where *Bivens* does apply," *Iqbal*, 556 U.S. at 675, any *Bivens* claim is still "subject to the defense of qualified immunity." *Malesko*, 534 U.S. at 72. Qualified immunity shields federal employees "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). There is "a two-step sequence for resolving government officials' qualified immunity claims," and the Court may address the steps in either order. *Pearson v. Callahan*, 555 U.S. 223, 232, 237-42 (2009). It may decide, first, "whether the facts that [Plaintiff] has alleged . . . make out a violation of a constitutional right" by the

---

[16] To the extent Plaintiff asserts an Eighth Amendment claim for damages against the individual defendants in their official capacities, those claims are barred by sovereign immunity. *See Biase v. Kaplan*, 852 F. Supp. 268, 285 n.14 (D.N.J. 1994) ("A suit against Federal officers in their official capacities is a suit against the United States . . . [and] is barred by the United States' sovereign immunity.").

Defendants, and, if they do, the Court "must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* at 232 (citations omitted). Whether a right is clearly established "requires a high 'degree of specificity.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (citation omitted).

Qualified immunity is "not a mere defense from liability; 'it is an entitlement not to stand trial or face the other burdens of litigation." *Curley v. Klem*, 298 F.3d 271, 277 (3d Cir. 2002) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). "Accordingly, the Supreme Court has repeatedly stressed the importance of resolving immunity questions at the earliest possible stages of the litigation." *Id.*

### A. Plaintiff Cannot State a Plausible Eighth Amendment Violation Against Defendants

The Eighth Amendment protects prisoners from cruel and unusual punishment, which can include intolerable conditions of confinement. *See Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). To plead such a claim requires facts showing that: (1) objectively, the deprivation was sufficiently serious, in that the challenged, official acts caused denial of "the minimal civilized measure of life's necessities"; and (2) subjectively, the defendant prison officials acted with "deliberate indifference to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the element of deliberate indifference, the plaintiff must establish that the prison officials actually knew of and disregarded an objectively serious risk of harm posed by the conditions. *See id.* at 839. There is also an immediate defense to such claims because "prison officials who actually knew of a substantial risk to inmate health or safety

54

may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844. (Note that what follows is in addition to the causation shortcomings discussed *supra*.)

In the COVID-19 context, courts have found that general policies and procedures instituted by BOP officials cannot rise to the level of an Eighth Amendment violation, even if those policies and procedures were followed inconsistently or were unsuccessful in slowing the spread of COVID-19. *See, e.g.*, *Hope*, 972 F.3d at 330 ("Nor does a failure to eliminate all risk establish that the Government was deliberately indifferent[.]"); *Wilson v. Williams*, 961 F.3d 829, 841 (6th Cir. 2020) (concluding that similar BOP COVID-19 policies and procedures were evidence that prison officials were not deliberately indifferent under the Eighth Amendment).[17]

---

[17] *See also Valentine v. Collier*, 978 F.3d 154 (5th Cir. 2020) (emphasizing that the prison policies put in place by the defendants, which included suspension of in-person visitation, requirements for social distancing and masks, testing, education to inmates, increased access to soap and toilet paper, and isolation of positive inmates were sufficient to show that defendants were not deliberately indifferent to the risks of COVID-19); *Swain v. Junior*, 961 F.3d 1276, 1287 (11th Cir. 2020) ("Neither the resultant harm of increasing infections nor the impossibility of achieving six-foot social distancing in a jail environment establishes that the defendants acted with subjective recklessness as used in the criminal law.") (internal quotation marks omitted); *Ross v. Russell*, No. 20-0774, 2022 WL 767093, at *11 (W.D. Va. Mar. 14, 2022) (reasoning that even if inmates "were not always properly quarantined, properly separated, or properly tested, and equipment and cleaning supplies were not always readily available," those allegations viewed "in conjunction with all steps that the prison officials did take to respond to the known risk" did not "reflect that any of the defendants in charge of creating or implementing overall policies were deliberately indifferent"); *Ryan v. Nagy*, No. 20-11528, 2021 WL 6750962, at *9 (E.D. Mich. Oct. 25, 2021), *R. & R. adopted in part*, No. 20-11528, 2022 WL 260812 (E.D. Mich. Jan. 26, 2022) ("The Eighth Amendment does not mandate perfect

Additionally, government officials "may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Iqbal*, 556 U.S. at 676. Instead, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id*. Similarly, "a *Bivens* action is not 'a proper vehicle for altering an entity's policy.'" *Abbasi*, 137 S. Ct. at 1860 (quoting *Malesko*, 534 U.S. at 74). Accordingly, a "party may establish liability for deprivation of a constitutional right only through a showing of personal involvement by each defendant." *Turney v. AG for the U.S. ex rel. Sec'y of Labor*, 502 F. App'x 180, 182−83 (3d Cir. 2012). "Personal involvement may be shown through personal direction, actual participation in the alleged misconduct, or knowledge of and acquiescence in the alleged misconduct." *Id*. Importantly, "broad allegations" and "general assertions" of involvement by a supervisory official in constitutional violations need not be taken as true. *Id*. (citing *Iqbal*, 556 U.S. at 678).

Federal courts reviewing "pandemic-management" claims under the Eighth Amendment—such as Plaintiff's claims—have required this established level of

---

implementation. . . . Even if Defendant's measures were ultimately unsuccessful at stopping all coronavirus infection with the jail, they were reasonable and thus not unconstitutional."); *Grinis v. Spaulding*, 459 F. Supp. 3d 289, 292 (D. Mass. 2020) ("These affirmative steps may or may not be the best possible response to the threat of COVID-19 within the institution, but they undermine an argument that the respondents have been actionably deliberately indifferent to the health risks of inmates."); *Chunn v. Edge*, 465 F. Supp. 3d 168, 203 (E.D.N.Y. 2020) (finding that a prison's measures to combat COVID-19 "indicate that prison officials are trying, very hard, to protect inmates against the virus and to treat those who have contracted it, and belie any suggestion that prison officials have turned the kind of blind eye and deaf ear to a known problem that would indicate deliberate indifference.").

specific personal involvement. *See Aipoalani v. Derr*, Civ. No. 22-00093, 2022 WL 1241822, at *5 (D. Haw. Apr. 27, 2022) ("For any claims against Warden Derr, Dr. Kwon, or Robl to proceed, [plaintiff] must plausibly allege that Warden Derr, Dr. Kwon, or Robl violated his rights through their own actions."); *Cook v. Fed. Bureau of Prisons*, Civ. No. 4:21-0766, 2021 WL 6064750, at *2 (N.D. Ohio Dec. 21, 2021) ("In order for liability to attach to a supervisor, a plaintiff must prove that the supervisor played more than a passive role in the alleged violations or showed mere tacit approval of the actions of employees.").

Plaintiff's Eighth Amendment claims fail as a matter of law because there is no pleading of direct, personal involvement in the alleged breaches of the Plaintiff's constitutional rights—apart from the mere allegation that Byrd and Wilks declined Plaintiff's request for a housing transfer. In his Complaint, Plaintiff refers to "BOP" of the FCI Fort Dix administration," without offering any specific pleading about what role any individual defendant played in the alleged Eighth Amendment violation. Under the precedent discussed above, this is not enough to maintain a claim against any of these Individual Defendants. This is particularly true as to claims of unconstitutional handling of medical care decisions by non-medical personnel because a "non-physician defendant is not deliberately indifferent to an inmate's serious medical need if the inmate is being treated by a prison doctor, unless the non-physician has reason to believe the inmate is being mistreated or not treated." *Coffey v. Fed. Bureau of Prisons*, Civ. No. 15-231-RMB, 2015 WL 1104546, at *3 (D.N.J. Mar. 11, 2015) (citing *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir.2004)).

Because Plaintiff's Complaint really pleads tort claims against the United States for pandemic management at FCI Fort Dix, and not individualized and specific allegations of Eighth Amendment violations by any of the Individual Defendants, the claims against Ortiz, Turner-Foster, Wilk, Haczynski, and Byrd should be dismissed for failure to state a claim.

### B.   Plaintiff's Pandemic-Management Claims Do Not Allege the Violation of a Clearly Established Right

Plaintiff's pandemic-management claims against Defendants also fail at the second step of the qualified-immunity analysis because they have not alleged the violation of a clearly established constitutional right. *Siegert v. Gilley*, 500 U.S. 226, 231-33 (1991); *Harlow*, 457 U.S. at 818. In deciding whether the constitutional right at issue was "clearly established," the Court "must first frame the precise contours of that right," being mindful that "courts are not to define clearly established law at a high level of generality." *Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 638 (3d Cir. 2015). Framing an issue too broadly "convert[s] the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.* at 639. Thus, the qualified immunity analysis is "fact specific." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

The issue here is whether a prison's development and implementation of precautionary measures to combat the spread of the COVID-19 virus based on various sources of federal guidance knowingly exposed this Plaintiff to an unjustifiably high risk of contracting that virus and suffering adverse results. There is no clear precedent that would have notified the Individual Defendants that BOP's response to

the COVID-19 pandemic at FCI Fort Dix recklessly increased risk, and, therefore, violated Plaintiff's Eighth Amendment rights. *See Ross*, 2022 WL 767093, at \*14 ("COVID-19 pandemic was a new and unusual issue, and there was ongoing and changing guidance from health officials at both the state and federal levels" in prisons).[18] The Individual Defendants were faced with unprecedented challenges in 2020. *See Hope*, 972 F.3d at 330. They "responded reasonably" by doing the best that they could with imperfect knowledge and limited resources. *See Farmer*, 511 U.S. at 839 (finding that "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."). Qualified immunity precludes holding the Individual Defendants personally responsible, with the benefit of hindsight, under the Eighth Amendment for those difficult decisions. Thus, the Individual Defendants are entitled to qualified immunity, and the Court should dismiss Plaintiff's *Bivens* claims against them.

---

[18] *See also Ryan*, 2021 WL 6750962, at \*9 (finding defendant prison officials were entitled to qualified immunity and explaining that "[t]he world's understanding of COVID-19 is constantly evolving, and there is no precedent that would have made it clear to a reasonable official that the measures Defendants took unreasonably responded to the COVID-19 pandemic"); *Tate v. Arkansas Dep't of Corr.*, No. 4:20-cv-558, 2020 WL 7378805, at \*11 (E.D. Ark. Nov. 9, 2020) (granting qualified immunity to prison officials who took precautionary measures in response to the pandemic because, even if they were inadequate, they were not clearly so; and reasoning that "COVID-19 is, by definition, a 'novel' coronavirus" which has posed challenges "unlike any other in the modern era," so a "reasonable official" would not have known if defendants' response violated the plaintiff's clearly established rights).

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should dismiss the complaint.

Respectfully submitted,

PHILIP R. SELLINGER
United States Attorney

Dated: <u>Nov. 15, 2023</u>          By:     <u>/s/ John Stinson</u>
JOHN STINSON
Assistant United States Attorney