**\*NOT FOR PUBLICATION**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

|  |  |  |
|---|---|---|
| | : | |
| AIKIAM FLOYD, | : | CIV. NO. 22-1229 (RMB-SAK) |
| | : | |
| Plaintiff, | : | **OPINION** |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA, et al., | : | |
| | : | |
| Defendants | : | |

_____

APPEARANCES:

AIKIAM FLOYD
3055 3rd Ave.
Bronx, NY 10451
        Plaintiff, pro se

HOPE LU, Assistant United States Attorney
Office of the United States Attorney
970 Broad Street
Newark, NJ 07102

JOHN T. STINSON, Assistant United States Attorney
Office of the United States Attorney
401 Market St., 4th Floor
Camden, NJ 08081
        On behalf of Defendants


RENÉE MARIE BUMB, Chief United States District Judge

      This matter comes before the Court upon Plaintiff Aikiam Floyd's ("Plaintiff")

_pro se_ prisoner complaint (Docket No. 1), Defendants United States of America, Mr.

Byrd, Mr. Haczynski, Mr. Wilks, Warden Ortiz, and Health Services Director Dr. Turner-Foster's ("Defendants") motion to dismiss the complaint (Mot. to Dismiss, Dkt. No. 39), Plaintiff's brief in opposition to the motion to dismiss (Pl's Opp. Brief, Docket No. 43), and Defendants' reply brief (Defs' Reply Brief, Docket No. 44). The Court will decide the motion on the briefs without an oral hearing, pursuant to Federal Rule of Civil Procedure 78(b). For the reasons discussed below, the Court will grant Defendants' motion to dismiss.

## I.   PROCEDURAL HISTORY

This case arises out of Plaintiff's conditions of confinement in the Federal Correctional Institution in Fort Dix, New Jersey ("FCI Fort Dix"), within the Federal Bureau of Prisons ("BOP"), during the COVID-19 pandemic from March 22, 2020 through February 2022. Plaintiff filed his complaint on March 7, 2022, and he was granted *in forma pauperis* status under 28 U.S.C. § 1915. (Compl., Dkt. No. 1; Order, Dkt. No. 6.) By Order dated December 16, 2022, Plaintiff's complaint was permitted to proceed beyond *sua sponte* screening for dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B). (Order, Dkt. No. 12.) Summons were returned as executed upon the following Defendants: the United States of America (Dkt. No. 17, 19), Mr. Byrd, Mr. Haczynski, Warden Ortiz, and Health Services Director Dr. Turner-Foster. (Dkt. No. 20.) On March 24, 2023, Assistant United States Attorney Peter Vizcarrando entered an appearance on behalf of Defendant United States of America. On August 7, 2023, Assistant U.S. Attorney John T. Stinson, Jr. entered an appearance on behalf of Defendants Byrd, Haczynski, Ortiz, Turner-Foster, and

Wilks.  (Dkt. No. 31.)  There is no indication on the docket that summons was executed on Defendant C.O. Johnson.  The John and Jane Doe Defendants have not been identified or served with process.

On August 28, 2023, this matter was reassigned to the undersigned.  (Dkt. No. 33.)  After receiving extensions of time to answer or otherwise respond to the complaint, Defendants filed a joint motion to dismiss for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim for relief under Rule 12(b)(6).  (Mot. to Dismiss, Dkt. Nos. 39.)  Plaintiff filed a brief in opposition to Defendants' motion to dismiss on January 17, 2024.  (Pl's Opp. Brief, Dkt. No. 43.)  Defendants filed a reply brief on January 29, 2024.  (Defs' Reply Brief, Dkt. No. 44.)  Plaintiff filed a notice of change of address on February 21, 2024. (Notice of Change of Address, Dkt. No. 45.)  Plaintiff is no longer incarcerated.

## II.    THE COMPLAINT

The pro se complaint begins with a summary of Plaintiff's claims.[1]  Plaintiff alleges that during the COVID-19 pandemic, BOP negligently transferred COVID-19 infected and contagious inmates from the Federal Correctional Institution ("FCI")

---

[1] Plaintiff submitted documentary evidence and an affidavit in support of his complaint. (Dkt. Nos. 1-1, 1-2, 1-3.)  "To decide a motion to dismiss [under Rule 12(b)(6), courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record."  *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (citing 5A C. Wright & A. Miller, Federal Practice and Procedure § 1357, at 299 (2d ed.1990); *Watterson v. Page*, 987 F.2d 1, 3–4 (1st Cir. 1993); *Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1198 (9th Cir. 1988)).  Evidence is not required to withstand a motion to dismiss for failure to state a claim, although it may be considered in determining a defendant's factual attack on jurisdiction under Rule 12(b)(1).

Elkton in Lisbon, Ohio[2] to FCI Fort Dix, New Jersey.  BOP then transferred contagious inmates internally within FCI Fort Dix, which caused half the inmate population, including Plaintiff, to become infected with COVID-19.  Plaintiff contends BOP was negligent in protecting his health, and deliberately indifferent to his health, by failing to impose, enforce and regulate Centers for Disease Control and Prevention ("CDC") policies[3] to reduce the spread of COVID-19 in FCI Fort Dix.  Defendants failed to adopt the basic recommendations of the CDC, and they made only limited use of the CARES Act home confinement provision[4] or other tools at their disposal to reduce the inmate population.  FCI Fort Dix never implemented or enforced a mandatory testing requirement for staff.  This permitted staff to infect the inmates. Plaintiff was infected with COVID-19 on several occasions.

The Court liberally construes the complaint, where the timeline of certain incidents is not clear, to allege the following.  On March 22, 2020, Plaintiff was assigned to FCI Fort Dix housing unit 5812 ("Unit 5812").  He sent Warden Ortiz an email stating that he feared for his life because a staff member was sick, potentially with COVID-19.  Lieutenant Guillepsi told the inmates in Unit 5812 to disregard the

---

[2]  Available at https://www.bop.gov/locations/institutions/elk/ (last visited June 15, 2024).

[3] The Court takes judicial notice, under Federal Rule of Evidence 201(b), of "CDC Guidance and Management of COVID-19 in Correctional and Detention Facilities" published on the CDC website on April 9, 2020.  Available at https://stacks.cdc.gov/view/cdc/86815 (last visited June 15, 2024).

[4] The Coronavirus Aid, Relief, and Economic Security ("CARES") Act, PL 116-136, March 27, 2020, 134 Stat 281, Sec. 12003(b)(2).

sick officer.  Plaintiff did not allege that he developed COVID-19 symptoms or a confirmed case of COVID-19 from exposure to this sick officer.

Plaintiff asserts a claim of cruel and unusual punishment, in violation of the Eighth Amendment, based on the overall conditions under which he lived in FCI Fort Dix during the COVID-19 pandemic from March 2020 through February 2022. Plaintiff alleges he was packed in his living quarters "like a sardine in a can."  There was no ventilation in the buildings.  The water provided for inmates to drink and shower was contaminated.  Some top-floor housing units had missing windows, which exposed inmates, including Plaintiff, to the elements.  During this period, Plaintiff was variously housed in two condemned units and three quarantine/isolation units.  The housing units had no heat and were infested with insects and rodents.  All food was served cold and sometimes moldy or freezer burned.

Plaintiff asserts a claim of intentional infliction of emotional distress.  At some point during the relevant time period, Plaintiff was taken to a hospital and placed on an IV.  The Court assumes this occurred after Plaintiff tested positive for COVID-19 on or about November 2, 2020.  When Plaintiff returned to FCI Fort Dix from the hospital, he was placed in a room in medical unit 5806 ("Unit 5806") overnight.  The room had no toilet or sink.  He was given a bottle to urinate in, but it overflowed into the cell.  Plaintiff had diarrhea and no toilet, no cleaning supplies, nor a change of clothing.  He was denied "the right of certain diagnostic test of infectious disease."  He was also denied timely medical treatment recommended by a healthcare provider.  The

complaint does not identify the recommended treatment or how long treatment was delayed.

Plaintiff alleges two incidents where his request for medical treatment was delayed:  (1) on March 5, 2021, medical staff did not provide timely evaluation and treatment of H. Pylori;[5] (2) and, at an unidentified time, Plaintiff asked C.O. Johnson for medical attention for shortness of breath, and Johnson told Plaintiff to wait for his unit officer.  The only remedy available to Plaintiff for his shortness of breath was to breathe into a paper bag.

In support of his claims that BOP and FCI Fort Dix staff were negligent or deliberately indifferent in their response to the risk to his health posed by COVID-19, Plaintiff alleges the following.  On October 19, 2020, Plaintiff, housed in Unit 5812, tested negative for COVID-19.  He learned that a staff person in Unit 5812 had tested positive and exposed three inmates.  Plaintiff was forced to return to Unit 5812 with the infected inmates, and his request for a separate quarantine was denied.

Plaintiff alleges medical staff were negligent by declaring people recovered from COVID-19 before they had two negative tests, as recommended by the CDC.  On October 22, 2020, 54 inmates in Unit 5812 tested positive.  On October 26, 2020, after 175 inmates in the unit had tested negative, FCI Fort Dix administration staff allowed COVID-19 positive inmates into Unit 5812.  On October 29, 2020, 105 inmates in Unit 5812 tested positive.  On November 2, 2020, Plaintiff and 45 other inmates in

---

[5] *See* Pl's Exhibit, Dkt. No. 1-2 at 14.

Unit 5812 tested positive.  By November 9, 2020, the entire housing unit was infected.  On November 18, 2020, Plaintiff tested negative, but he remained housed with infected inmates.

On December 3, 2020, the status of Unit 5812 was changed to "recovered," and Plaintiff was transferred to Unit 5852 the next day.  No testing was done before the transfer.  Within three or four weeks, there was a COVID-19 outbreak in Unit 5852.  Staff did not test any inmate who had been transferred from Unit 5812.  One of the inmates who transferred into Unit 5852 had a positive COVID-19 test two weeks before his transfer.  Plaintiff alleges this contributed to his infection with COVID-19.  He suffered from many symptoms.  Throughout the relevant time period of March 2020 through February 2022, Plaintiff was housed in three different quarantine/isolation units including: 5812, 5852, 5806, and two condemned housing units, 5703 and 5803.

For relief, Plaintiff seeks damages and injunctive relief, as follows:  remove lead pipes and lead paint from all BOP buildings; provide clean water at all BOP locations; and bring all housing units up to the standard of living at all BOP locations.  Plaintiff asserts jurisdiction under *Bivens*[6] over his damages claims for violation of the Eighth Amendment Cruel and Unusual Punishments Clause.  He asserts jurisdiction for

---

[6] *See Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1974) (recognizing a judicially created damages remedy where federal actors allegedly violated the Fourth Amendment prohibition on unreasonable search and seizure.)

injunctive relief under federal question jurisdiction, 28 U.S.C. § 1331.[7] Finally, he asserts jurisdiction over his tort claims under the Federal Tort Claims Act ("FTCA") 28 U.S.C. §§ 2671 *et seq.* and 1346(b) *et seq.* based on negligence or deliberate indifference in response to the risk posed by COVID-19, and intentional infliction of emotional distress by federal employees.

## III.    THE PARTIES' ARGUMENTS

### A.    Defendants' Motion to Dismiss

Defendants seek dismissal of Plaintiff's:  (1) unexhausted FTCA claims for lack of jurisdiction; (2) exhausted FTCA claim for lack of jurisdiction under the discretionary function exception;  (3) exhausted FTCA claim for lack of jurisdiction under the quarantine exception; (4) unexhausted *Bivens* claims for lack of jurisdiction; (5) all *Bivens* claims for lack of jurisdiction, because a *Bivens* remedy is not available in a new context where special factors counsel hesitation in creating a new remedy; and alternatively, (6) exhausted *Bivens* claim for failure to state a claim under Rule 12(b)(6), because Defendants are entitled to qualified immunity.  (Mot. to Dismiss, Dkt. No. 39-2.)

### B.    Plaintiff's Brief in Opposition to the Motion to Dismiss

Plaintiff opposes Defendants' motion to dismiss for lack of jurisdiction and for failure to state a claim upon which relief may be granted.  (Pl's Opp. Brief, Dkt. No.

---

[7] Plaintiff's request for injunctive relief is moot because he has been released from confinement under the custody of the Bureau of Prisons. *See e.g. Sutton v. Rasheed*, 323 F.3d 236, 248 (3d Cir. 2003), as amended (May 29, 2003).

43.)  Plaintiff reiterates the allegations and legal claims in his complaint and concludes that he has exhausted his remedies, and that he has adequately alleged negligence and intentional infliction of emotional distress under the FTCA, and cruel and unusual punishment in violation of the Eighth Amendment.

### C.   Defendants' Reply Brief

Defendants maintain that Plaintiff failed to respond to the substance of their arguments.  (Defs' Reply Brief, Dkt. No. 44.)  Therefore, the Court may either deem Plaintiff to have waived opposition to their motion to dismiss, or grant their motion to dismiss on the merits of their arguments.  The Court will address the merits of Defendants' arguments.

## IV.   DISCUSSION

### A.   Rule 12(b)(1) Standard of Law

Defendants seek dismissal of the complaint for lack of subject matter jurisdiction based on a factual attack to jurisdiction.  "[A] factual 12(b)(1) challenge attacks allegations underlying the assertion of jurisdiction in the complaint, and it allows the defendant to present competing facts."  *Hartig Drug Co. Inc. v. Senju Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016) (quoting *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014)).  "[T]he court 'is free to weigh the evidence[, including evidence outside the pleadings,] and satisfy itself as to the existence of its power to hear the case," and "no presumptive truthfulness attaches to [the] plaintiff's allegations....'"  *Id.* (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891

(3d Cir. 1977) (first alteration added)).  The burden is on the plaintiff to establish the court's jurisdiction.  *Lightfoot v. United States*, 564 F.3d 625, 627 (3d Cir. 2009).

### B.  Administrative Exhaustion Requirement of the FTCA

Defendants argue that Plaintiff has not exhausted all FTCA claims alleged in his complaint, and the unexhausted claims should be dismissed for lack of jurisdiction. "The FTCA operates as a limited waiver of the United States'[] sovereign immunity" from suits by its citizens.  *White-Squire v. United States Postal Serv.*, 592 F.3d 453, 456 (3d Cir. 2010) (citing *Roma v. United States*, 344 F.3d 352, 362 (3d Cir. 2003)).  Courts "'should not take it upon [them]selves to extend the waiver beyond that which Congress intended.'"  *Id.* (quoting *United States v. Kubrick*, 444 U.S. 111, 117-18 (1979)).  Thus, courts should strictly enforce the procedural requirements of the FTCA. *Id.*

> Under the FTCA, prior to commencing an action in court, a plaintiff
>
>> shall have first presented the claim to the appropriate Federal agency and [the] claim shall have been finally denied by the agency in writing and sent by certified or registered mail. The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant, any time thereafter, be deemed a final denial of the claim for purposes of this section.

28 U.S.C. § 2675(a) (alteration added).  "The statute requires 'complete exhaustion' of administrative remedies before a claimant can seek relief in court." *Ahmed v. United States*, 334 F. App'x 512, 513 (3d Cir. 2009) (citing *McNeil v. United States*, 508 U.S. 106, 112 (1993)).  A plaintiff may not "'present one claim to the agency and then maintain suit on the basis of a different set of facts.'" *Roma v. United States*, 344 F.3d

352, 362 (3d Cir. 2003) (quoting *Deloria v. Veterans Admin.*, 927 F.2d 1009, 1011–12 (7th Cir. 1991)).  Pursuant to 28 U.S.C. § 2675, the notice of a plaintiff's claim to the federal agency, in claim form SF-95, must allege sufficient facts to allow the agency to investigate.  *Roma*, 344 F.3d at 363 (citing *Tucker v. United States Postal Serv.*, 676 F.2d 954, 959 (3d Cir. 1982)).

Defendants submit that jurisdiction under the FTCA in this Court exists solely over the FTCA claim contained in Plaintiff's SF-95 claim form.  BOP received Plaintiff's SF-95 claim form on January 12, 2021.  (Declaration of Corrie Dobovich ("Dobovich Decl.") ¶ 7, Attach. E (Dkt. No. 39-3 at 37-41.))  Plaintiff exhausted the following claim:

> 1).  I'm a[n] inmate at the FCI Fort Dix.
>
> 2).  I tested negative on October 19, 2020, for COVID-19, on this same day I found out that the R&D staff had tested positive with COVID-19 virus, and had exposed three inmates that was housed in same living quarters as myself to the COVID-19 virus, that Housing Unit ("H.U.") #5812. I immediately went to the Unit Manager Mr. Byrd, and the Health Services Administrator Mr. Wilk, requesting to be moved from the Housing Unit, where the inmates that had test[ed] positive for coronavirus, because I tested negative.
>
> 3).  On October 20, 2020, testing was conducted again in H.U. #5812, for the COVID-19 virus, however, I was not tested.
>
> 4).  On October 22, 2020, the testing results confirmed that 54 inmates w[ere] positive [for] COVID-19, in the H.U. #5812, and those w[ere] removed from the Unit that evening at 4:20 p.m.
>
> 5.)  On October 26, 2020, FCI Fort Dix's administration staff exposed healthy inmates like myself to COVID-19,

11

when … those inmates that w[ere] positive [for] COVID-19 w[ere] placed in rooms with no ventilation, and limited space in the living quarters. Th[e]n, around 1:30 p.m. [on] October 26, 2020, after two more inmates had tested positive for COVID-19, the 56 inmates w[ere] moved back into H.U. # 5812, among the 175 inmates that had [previously] tested negative.

6.) On October 29, 2020, [] 105 inmates in H.U.#5812, tested positive for COVID-19 virus. I was among [] 70 inmates that again tested negative, but was being forced to remain in the H.U. # 5812.

7). On November 2, 2020, I tested positive for the COVID-19 virus, along with 45 other inmates in the H.U. # 5812, this r[a]ised the number of positive COVID-19 cases.

8). As of November 5, 2020, 207 confirmed cases of inmates infected with COVID-19 virus in H.U. #5812. By November 9, 2020, the entire Housing Unit # 5812's inmates w[ere] confirmed cases of COVID-19 virus.

9). The FCI Fort Dix[] Prison Administration Staff['s] scheme in place, to identify, and isolate COVID-19 infected inmates failed. The Bureau of Prisons has failed to impose or enforce a policy, or regulation in accord[ance] to the Centers of Disease Control advisory guideline for social distance, within the FCI Fort Dix[.] Also because of impossible factor that social distance has proven to be here in the prison complex, and impossible for protecting inmates from COVID-19 virus, or to control the COVID-19 pandemic and by both BOP's and Warden Ortiz of FCI Fort Dix's not meeting the basic recommendation of Center of Disease Control ("CDC") making only limited use of "CARES ACT" home confinement as well as other material tools at their disposal to reduce the prison general population during the COVID-19 pandemic. The failures of the Bureau's profound [] vested responsibilities, and obligations in the protection and health of its inmates such as myself have create[d] conditions of my confinement to render cruel and unusual to me under the oppressor's hands and mind states of deliberate[] indifference, with negligen[t] conduct.

10.  Mandatory testing requirement for staff has not been enforced, or implemented at the FCI Fort Dix, which permitted staff members to transport the COVID-19 virus into the prison complex and into the inmates['s] living quarters ("Housing Units"), as well as the Special Housing Unit ("SHU").

11).  I have not been tested for the COVID-19 virus, since testing positive on November 16, 2020, and November 18, 2020, but was transferred to the Residential Drug Abuse Program ("RDAP") in the Housing Unit # 5852, among other inmates that have never been tested, or have tested negative for COVID-19 virus.

12.  The Medical staff at FCI Fort Dix, d[uring] my time in the H.U. # 5812, never on[ce] taking blood tests, before sending me to RDAP.

13.  My transfer[] to the Housing Unit #5852 … occurred on December 4, 2020, and again I was not tested although my last test of November 18, 2020, confirmed I was positive with coronavirus.

14.  I had symptoms that consisted of diarrhea, back and body aches, stomach cramps, vomiting, dizzines[s], chest pains, headaches, los[s] of taste, and f[a]tigue.

15.  During my periods of quarantining I was in a room with 11 other inmates, in the open Housing Unit #5812, where every inmate[] in the housing unit had access to the room I was quarantine[d] in.  Please note:  Prior to the COVID-19 pandemic in H.U.#5812 a townhall meeting was held and at that townhall meeting Dr. [Turner-]Foster, informed [us] that staff could get tested for the [C]ovid-19, but it was not mandatory for them to do so, because when they entered the facility they w[ere] allegedly to have their temperatures checked[.]   Nevertheless, staff members, in R&D, the din[]ing hall and RDAP building [] tested positive for COVID-19 before and after the COVID-19 pandemic within[] the prison complex.

(*Id.* at 39-41.)

Accordingly, Defendants maintain that jurisdiction over Plaintiff's FTCA claim are limited to the above allegations.  His claim for "intentional infliction of emotional distress" is unexhausted, as are the allegations in the complaint regarding the following:

- The United States was negligent by transferring inmates from FCI Elkton to FCI Fort Dix.

- The United States deliberately or negligently failed to provide adequate medical care at FCI Fort Dix.

- The United States deliberately or negligently ran overcrowded housing, failed to address pest infestations, failed to provide ventilation and/or heat, and provided contaminated water and/or improper food.

- The United States deliberately or negligently placed Plaintiff in a cell/room without adequate toileting facilities while he was ill [his intentional infliction of emotional distress claim].

- The United States negligently maintained housing facilities with peeling paint, lead paint, and/or lead pipes.

(Compl., Dkt. No. 1 at 2, 4-7, 10-11.)

Upon review of Plaintiff's SF-95 form, the only FTCA claim Plaintiff exhausted before filing his complaint is that negligence and/or deliberate indifference by federal employees of BOP and FCI Fort Dix caused him to contract COVID-19 on November 2, 2020. (Dobovich Decl. ¶ 7, Attach. E (Dkt. No. 39-3 at 37-41.))    In this exhausted FTCA claim, Plaintiff alleged Government employees failed to adopt and implement adequate COVID-19 testing and quarantine policies and practices at FCI Fort Dix. Plaintiff also exhausted the claim that Government employees were negligent and/or

14

deliberately indifferent to his health by limiting use of the CARES Act home confinement provision to reduce the prison population, create space for social distancing, and reduce the spread of COVID-19 in prison.   As a result, Plaintiff contracted COVID-19 and suffered from diarrhea, back and body aches, stomach cramps, vomiting, dizziness, chest pains, headaches, loss of taste, and fatigue.   The Court lacks jurisdiction over the remaining FTCA claims in the complaint, outlined by Defendants above.   The Court will dismiss without prejudice the unexhausted FTCA claims under Fed. R. Civ. P. 12(b)(1).[8]   Therefore, the Court turns to whether the discretionary function exception bars Plaintiff's exhausted FTCA claim.

### C.    Discretionary Function Exception to FTCA

Based on the waiver of sovereign immunity under the FTCA, an individual may bring a tort claim against the United States under 28 U.S.C. § 1346(b)(1) for

> personal injury caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

Under the discretionary function exception, this waiver of sovereign immunity

> shall not apply to—
>
> (a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or

---

[8] *See, e.g.*, *Wadhwa v. Nicholson*, 367 F. App'x 322, 325 (3d Cir. 2010) (holding district court properly dismissed without prejudice unexhausted FTCA claim); *Bray v. Bon Secours Mercy Health, Inc.*, 97 F.4th 403, 418 (6th Cir. 2024) ("We therefore find that the district court correctly dismissed plaintiffs' [FTCA] claim without prejudice for failure to exhaust[.]")

> regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.…

28 U.S.C. § 2680(a).

### 1. Unconstitutional Government Conduct Is Per Se Outside the Discretionary Function Exception.

Recently, the Third Circuit held that "unconstitutional government conduct is per se outside the discretionary function exception[,]" because a Government employee does not have discretion to violate the Constitution. *Xi v. Haugen*, 68 F.4th 824, 839 (3d Cir. 2023). "At the motion-to-dismiss stage, all a plaintiff must do to negate the discretionary function exception is plausibly allege a constitutional violation." *Id.* at 840. Thus, the Court will first determine whether Plaintiff's exhausted FTCA claim states a plausible constitutional violation.

### a. Whether Plaintiff adequately alleged that Government employees, by limiting the use of Cares Act home confinement to reduce the prison population, violated the Eighth Amendment?

Plaintiff exhausted his FTCA claim that Government employees were deliberately indifferent to his health and safety[9] by limiting the use of their authority

---

[9] "A claim of inhumane prison conditions may rise to the level of an Eighth Amendment violation where the prison official 'deprived the prisoner of the minimal civilized measure of life's necessities' and 'acted with deliberate indifference in doing so, thereby exposing the inmate to a substantial risk of serious damage to [his] future health.'" *Palakovic v. Wetzel*, 854 F.3d 209, 225 (3d Cir. 2017) (quoting *Parkell v. Danberg*, 833 F.3d 313, 335 (3d Cir. 2016) (quoting *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 226 (3d Cir. 2015)).

to reduce the prison population during the COVID-19 pandemic.  The Coronavirus

Aid, Relief, and Economic Security ("CARES") Act, provides, in relevant part:

> HOME CONFINEMENT AUTHORITY.—During the covered emergency period, if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau [of Prisons], the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate.

PL 116-136, March 27, 2020, 134 Stat 281, Sec. 12003(b)(2) (alteration added).  The

Court takes judicial notice, under Federal Rule of Civil Procedure 201(b), of the Office

of Attorney General's March 26, 2020 "Memorandum for Director of Bureau of

Prisons[.]"  (Declaration of Ashley ("Crisson Decl."), Attach. J, Dkt. No. 39-4 at 88-

90.)  The Attorney General instructed the Director of the Bureau of Prisons to "transfer

inmates to home confinement where appropriate to decrease the risks to their health."

The Attorney General offered this guidance, "[i]n assessing which inmates should be

granted home confinement . . . ,  you are to consider the totality of the circumstances

for each individual inmate, the statutory requirements for home confinement, and the

following non-exhaustive list of discretionary factors[.]"  *Id.*  The listed factors

included the age and medical vulnerability of the inmate, the security level of the

facility where the inmate was housed, the inmate's conduct in prison, the inmate's

recidivism risk score ("PATTERN score"), the inmate's re-entry plan, the inmate's

crime of conviction, and an assessment of the risk of danger posed to the community by the inmate's release to home confinement.  *Id.*

The Court takes judicial notice of the April 3, 2020, "Memorandum for Director of Bureau of Prisons" issued by the Attorney General.  (Crisson Decl., Attach. K, Dkt. No. 39-4 at 91-94).  Pursuant to the CARES act, the Attorney General directed the Bureau of Prisons to "immediately maximize appropriate transfers to home confinement of all appropriate inmates" from the correctional facilities most affected by the spread of COVID-19.  In the memorandum, the Attorney General also conveyed the following message:

> The last thing our massively over-burdened police forces need right now is the indiscriminate release of thousands of prisoners onto the streets without any verification that those prisoners will follow the laws when they are released, that they have a safe place to go where they will not be mingling with their old criminal associates, and that they will not return to their old ways as soon as they walk through the prison gates.  Thus, while I am directing you to maximize the use of home confinement at affected institutions, it is essential that you continue making the careful, individualized determinations BOP makes in the typical case.  Each inmate is unique and each requires the same individualized determinations we have always made in this context.

Plaintiff's vague allegation that BOP staff were deliberately indifferent to his health by limiting their use of CARES Act home confinement fails to state an Eighth Amendment claim.  By delegation from the Attorney General, the CARES Act required BOP employees to consider the totality of circumstances for each offender before releasing the offender to home confinement.  It is difficult to imagine how

Plaintiff could establish deliberate indifference by the limited use of home confinement for inmates in this context.  Therefore, the FTCA claim does not allege a constitutional violation, and it is subject to the discretionary function exception, if applicable.

> **b.**  **Whether Plaintiff adequately alleged that BOP and FCI Fort Dix employees violated the Eighth Amendment by failing to adopt, implement and enforce mandatory COVID-19 testing and effective quarantine procedures?**

Plaintiff alleged a second theory of liability in support of his exhausted FTCA claim, that Government employees were deliberately indifferent to his health, constituting cruel and unusual punishment, by failing to adopt, implement and enforce mandatory testing and adequate quarantine measures to his prevent his exposure to COVID-19.  The Eighth Amendment imposes duties on prison officials "who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must "take reasonable measures to guarantee the safety of the inmates[.]"  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citing *Hudson v. Palmer*, 468 U.S. 517, 526–527 (1984) (additional citations omitted)); *accord Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 256 (3d Cir. 2010).  Specifically, under the Eighth Amendment, "prison officials may [not] be deliberately indifferent to the exposure of inmates to a serious, communicable disease."  *Helling v. McKinney*, 509 U.S. 25, 33 (1993).  In other words, prison officials have a limited duty to protect an inmate's future health.  *Id.*  To allege the objective component of such a claim, the plaintiff must show "that he [] is being exposed to" an unreasonable risk to

his health. *Id.* at 35. This entails inquiry into "the seriousness of the potential harm" and "requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." *Id.* at 36; *see Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 372–73 (3d Cir. 2019) (quoting *Farmer*, 511 U.S. at 834) ("the deprivation alleged must be, objectively, 'sufficiently serious,'" resulting in "the denial of 'the minimal civilized measure of life's necessities.'")

The subjective component of an Eighth Amendment conditions of confinement claim demands a showing that "prison officials are deliberately indifferent to [the prisoner's] plight." *Id.* at 35. "[D]eliberate indifference describes a state of mind more blameworthy than negligence[.]" *Farmer*, 511 U.S. at 835. The Supreme Court explained the standard as follows:

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* at 837. If the official did not perceive a significant risk, his conduct "cannot . . . be condemned as the infliction of punishment." *Id.* at 838.

In a case brought by immigration detainees, the Third Circuit held the Constitution does not require prison officials to eliminate all risk that an inmate will contract COVID-19. *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 330 (3d Cir. 2020). Plaintiff alleges Government employees were deliberately indifferent to his

health because they "were not meeting the basic recommendation of [CDC]." (Compl., Dkt. No. 1 at 2.)   The Government looked to CDC for guidance on responding to the spread of the novel COVID-19 virus.  The Court takes judicial notice of "People who are at higher risk for severe illness" published on the CDC website on March 22, 2020.[10]   CDC continued to update this information based on new

---

[10] Available at https://stacks.cdc.gov/view/cdc/86074.  The CDC advised:

> Based upon available information to date, those at high-risk for severe illness from COVID-19 include:
>
> > People aged 65 years and older
> >
> > People who live in a nursing home or long-term care facility
> >
> > Other high-risk conditions could include:
> >
> > > People with chronic lung disease or moderate to severe asthma
> > >
> > > People who have serious heart conditions
> > >
> > > People who are immunocompromised including cancer treatment People of any age with severe obesity (body mass index [BMI] >40) or certain underlying medical conditions, particularly if not well controlled, such as those with diabetes, renal failure, or liver disease might also be at risk
> > >
> > > People who are pregnant should be monitored since they are known to be at risk with severe viral illness, however, to date data on COVID-19 has not shown increased risk
>
> Many conditions can cause a person to be immunocompromised, including cancer treatment, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications

information.[11]  Plaintiff did not allege that he had any of the risk factors that put him at higher risk for severe illness from COVID-19.

Nevertheless, early in the pandemic, CDC had not determined all risk factors that might cause an individual to be at higher risk for severe illness or death from COVID-19.  The Government turned to CDC to recommend measures to protect everyone, not just those known to be at higher risk, from contracting the virus. Therefore, Plaintiff sufficiently alleged that the danger to his health was sufficiently serious that contemporary standards of decency would not allow Defendants to sit idly by while the virus spread to inmates who were not known to be at higher risk for severe illness or death from COVID-19.

Under the Eighth Amendment, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer,* 511 U.S. at 844.  In the early days of the pandemic, CDC guidance was "based on what is currently known about the transmission and severity of coronavirus disease 2019 (COVID-19) as of March 30, 2020."  CDC Guidance and Management of COVID-19 in Correctional and Detention Facilities, *supra* n. 3.  To prevent the spread of COVID-19 within correctional and detention facilities, CDC recommended "screen everyone coming in for symptoms," and specifically "screen … staff daily on entry."

---

[11]  *See* "Underlying Medical Conditions Associated with Higher Risk for Severe COVID-19: Information for Healthcare Professionals" (updated April 12, 2024).  Available at https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-care/underlyingconditions.html.

*Id.* at 8-9.   Regarding isolation and quarantine, CDC recommended immediate medical isolation for "symptomatic people," ideally to be confined to an individual cell, but if unavailable, confined in a cohort of similar inmates.  *Id.* at 13-15.  CDC recommended that inmates with confirmed cases of COVID-19 should not be grouped or "cohorted" with inmates with suspected cases of COVID-19.  *Id.* at 16.

CDC's quarantine recommendations, as of March 30, 2020, included identifying those inmates with close contacts to a confirmed or suspected case of COVID-19.  *Id.* at 18.  When quarantine of a single exposed inmate in a single cell was unavailable, group cohorting was the next best option.  *Id.* at 19.  If inmates in a whole housing unit were exposed, CDC recommended the inmates quarantine in place.  *Id.* at 19.  CDC also recommended that facilities "do not add people to an existing quarantine cohort" and "do not mix people quarantined due to exposure with people under routine intake quarantine."  *Id.* at 20.

Plaintiff alleges he was exposed to COVID-19 in October 2020, and he tested positive on November 2, 2020.  On October 7, 2020, CDC published an update to its guidance for correctional and detention facilities.[12]  In addition to verbal screening and temperature checks daily for staff, CDC recommended facilities "consider strategies for testing asymptomatic staff without known [] exposure" and "[f]ollow guidance from the Equal Employment Opportunity Commission when offering testing to staff."

---

[12] *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Oct. 7, 2020, at 2, https://www.lb7.uscourts.gov/documents/14-186URL3correction-.pdf.

23

*Id.* at 14.   CDC did not recommend mandatory testing of staff.   Therefore, Plaintiff's allegation that BOP and FCI Fort Dix staff were deliberately indifferent to his health by failing to implement and enforce mandatory staff testing, an action that went beyond CDC's recommendations, fails to state an Eighth Amendment claim.

Plaintiff further alleged that inadequate quarantine policies and practices caused him to contract COVID-19 on November 2, 2020.   Accepting Plaintiff's allegations as true, he was in quarantined housing Unit 5812 on October 19, 2020.   He tested negative on October 19, 2020, and again on October 29, 2020, but he was not removed from the quarantine unit.   At that time, CDC advised, "[c]ohorting multiple quarantined close contacts could transmit SARS-CoV-2 from those who are infected to those who are uninfected. Cohorting should only be practiced if there are no other available options."   *Id.* at 25.   Plaintiff has not alleged that any other quarantine housing options were available at FCI Fort Dix.   CDC further recommended:

> Incarcerated/detained persons who are close contacts of someone with confirmed or suspected COVID-19 (whether the infected individual is another incarcerated/detained person, staff member, or visitor) should be placed under quarantine for 14 days. … :
>
> > ◦ If a quarantined individual is tested again during quarantine and they remain negative, they should continue to quarantine for the full 14 days after last exposure and follow all recommendations of local public health authorities.

*Id.* at 24.   Plaintiff alleges Defendants were deliberately indifferent to his health because he was exposed to inmates who tested positive for COVID-19 on October 19,

22, 26, and 29, 2020. However, CDC recommended exposed inmates remain in quarantine for a full 14 days **since their last exposure**. *Id.* (emphasis added). Thus, Plaintiff failed to allege Defendants were deliberately indifferent by failing to implement the CDC quarantine release recommendation.

Plaintiff further alleges in his exhausted FTCA claim that on October 26, 2020, 56 inmates who tested positive for COVID-19 were removed from Unit 5812 to medical isolation, but they were returned to Unit 5812 later that afternoon. CDC recommended that:

> If the facility is housing individuals with confirmed COVID-19 as a cohort:
>
> ◦ Only individuals with laboratory-confirmed COVID-19 should be placed under medical isolation as a cohort. Do not cohort those with confirmed COVID-19 with those with suspected COVID-19, with close contacts of individuals with confirmed or suspected COVID-19, or with those with undiagnosed respiratory infection who do not meet the criteria for suspected COVID-19[.]

*Id.* at 20.

However, in its guidance to correctional and detention facilities CDC stated, "[t]he guidance may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions." *Supra* note 13. Because Plaintiff has not alleged that FCI Fort Dix had no valid reason to adapt the CDC quarantine/medical isolation policy, he has not sufficiently pled that Defendants acted with deliberate indifference to his health. CDC guidelines were advisory. Without alleging Defendants had a safer option reasonably available to

them and chose not to follow it, Plaintiff fails to allege the element of deliberate indifference.  The Court turns to whether the discretionary function exception is applicable to Plaintiff's claims of negligence.

### 2.      Application of the Discretionary Function Exception

The discretionary function exception "marks the boundary between Congress's willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals."  *United States v. S.A. Empresa de Viacao Aereo Rio Gradense* (Varig Airlines), 467 U.S. 797, 808 (1984).  With this exception, Congress sought to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort . . . ."  *United States v. Gaubert*, 499 U.S. 315, 323 (1991) (internal quotations omitted).

"To invoke the discretionary-function exception, the Government must show two things:  (1) its agent's action "involve[d] an element of judgment or choice" and (2) its agent's judgment was "of the kind that the ... exception was designed to shield," meaning that it was "susceptible to policy analysis."  *Clark v. Sec'y of United States Navy*, No. 23-1784, --F.4th--, 2024 WL 2340775, at *1 (3d Cir. May 23, 2024) (quoting *Gaubert*, 499 U.S. at 322–23, 325 (brackets and internal quotation marks omitted in *Clark*).  It has long been recognized, in the prison administration context, that BOP is "accorded wide ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline

and to maintain institutional security." *Whitley v. Albers*, 475 U.S. 312, 321, 322 (1986).

Under the first step of the discretionary function analysis, "[i]f a law, regulation, or policy leaves the agent no meaningful choice, the exception does not apply." *Clark* 2024 WL 2340775, at *2 (quoting *Xi v. Haugen*, 68 F.4th 824, 837–38 (3d Cir. 2023)). The Government must show its agent(s) had the discretion to act. *Id.* A plaintiff may attempt to rebut the Government's showing by pointing to limits on that discretion. *Id.* At the second step of the analysis, "the Government must show that the agent's function was discretionary." *Id.* Courts must look at the agent's duty and determine the discretion needed to carry out that duty. *Id.* If the agent's duty can be analyzed or debated in policy terms, courts should presume that the exception applies. *Id.*

Plaintiff alleges BOP and FCI Fort Dix staff had a duty to protect inmate health by reducing the spread of COVID-19 in the prison.  18 U.S.C. § 4042(a) provides, in relevant part:

> (a) In general.--The Bureau of Prisons, under the direction of the Attorney General, shall—
>
> > (1) have charge of the management and regulation of all Federal penal and correctional institutions;
> >
> > (2) provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise[.]

This statute gives BOP officials discretion in carrying out these duties. *Sargent v. United States*, 620 F. App'x 69, 71 (3d Cir. 2015).

**a.** **Discretionary nature of CARES Act home confinement provision.**

Plaintiff alleges BOP and FCI Fort Dix employees were negligent in protecting his health by limiting their use of the CARES Act home confinement provision to reduce the prison population and allow for social distancing.  As discussed above, the CARES Act allowed BOP complete discretion in determining whether each individual prisoner was appropriate for early release to home confinement.  Plaintiff has not pointed to any mandatory statute or regulation.

The next question is for application of the discretionary function exception is whether the discretionary judgment at issue is susceptible to policy analysis.  CARES Act home confinement determinations for each individual prisoner involved social policy considerations.  BOP was directed to weigh factors regarding the risk of each inmate's exposure to COVID-19 and the danger each inmate posed to society before releasing an inmate to home confinement during the pandemic.  Therefore, the discretionary function exception bars Plaintiff from bringing this claim under the FTCA.

**b.** **Discretionary nature of CDC guidance for correctional and detention facilities.**

Plaintiff alleges BOP and FCI Fort Dix employees were negligent in protecting his health by failing to impose mandatory COVID-19 testing, failing to quarantine inmates who tested positive for COVID-19 from those who tested negative for COVID-19; and failing to implement the "basic recommendations" of the CDC. Again, 18 U.S.C. § 4042 allows BOP discretion in "provid[ing] suitable quarters and

provid[ing] for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States...." *Rinaldi v. United States*, 904 F.3d 257, 273 (3d Cir. 2018). "The [Supreme] Court also emphasized that the judiciary is "ill equipped to deal with the increasingly urgent problems of prison administration and reform" and should therefore give significant deference to judgments made by prison officials in establishing, interpreting, and applying prison regulations. *Fraise v. Terhune*, 283 F.3d 506, 515 (3d Cir. 2002) (quoting *Turner v. Safely*, 482 U.S. 78 at 84–85 (1987)).

Plaintiff does not point to any mandatory statute, regulation or BOP policy for the protection of inmates from COVID-19 in FCI Fort Dix. Instead, his claim is based on the failure to follow CDC's guidance for correctional and detention facilities, particularly for staff testing and quarantine procedures. CDC's recognized the discretionary nature of its guidance; "[t]he guidance may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions." *Supra* note 11. Therefore, the Court must determine whether the exercise of such discretion by BOP and FCI Fort Dix staff involved policy considerations.

The issue of mandatory testing of staff raised social and economic policy considerations. Staff may have been unwilling to be tested at their own expense, on their own time, or for other personal reasons. Staff resignations over mandatory testing may have presented severe operational issues for FCI Fort Dix. If the cost of mandatory testing was to be covered by the prison, this raised economic policy

29

considerations on how to best spend the limited resources available for operating the prisons, as many more expenses would be anticipated during a nationwide pandemic.

The decision of how to quarantine inmates was dependent on the availability of testing, physical space and staff.  The decision required prison officials to set priorities to accommodate all the different risks posed to inmates and staff, and to meet all the basic needs of all inmates.  Such determinations implicate social and public policy considerations with prison operations.  *See Rinaldi*, 904 F.3d at 273 (decisions regarding prison housing and cellmate assignments involve the type of policy considerations the discretionary function exception of the FTCA was designed to protect); *Donaldson v. United States*, 281 F. App'x 75, 77 (3d Cir. 2008) (internal quotation omitted ) ("how best to protect one inmate from the threat of attack by another—is of the kind that the discretionary function exception was designed to shield"); *Calderon v. United States*, 123 F.3d 947, 951 (7th Cir. 1997) ("It is clear that balancing the need to provide inmate security with the rights of the inmates to circulate and socialize within the prison involves considerations based upon public policy"); *Busara v. United States*, No. 2:21-CV-4055, 2023 WL 4946460, at *8 (W.D. La. Apr. 27, 2023), *report and recommendation adopted sub nom. Busara v. USA*, No. 2:21-CV-04055, 2023 WL 4938479 (W.D. La. Aug. 2, 2023) (finding the task of responding to a global pandemic involves social, economic and political policy).  Therefore, the discretionary function exception to the FTCA bars Plaintiff's exhausted claim. Consequently, only Plaintiff's *Bivens* claims remain.

**D.      Whether the Court Should Imply a Damages Remedy for New *Bivens* Claims?**

"[E]xpanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Ziglar v. Abbasi*, 582 U.S. 120, 135 (2017).  In prior cases, the Supreme Court recognized a *Bivens* remedy only three times: (1) *Bivens*,[13] a Fourth Amendment unreasonable search and seizure claim based on the warrantless search of the claimant's home by federal narcotics agents, and his arrest on narcotics charges without probable cause; (2) *Davis v. Passman*, 442 U.S. 228 (1979), a Fifth Amendment equal protection claim against a Congressman for gender discrimination in the workplace; and (3) *Carlson v. Green*, 446 U.S. 14 (1980), an Eighth Amendment claim against federal prison officials for failing to provide emergency medical care to treat an inmate's life-threatening asthma.  *Id.* at 130-31.

In 2022, the Supreme Court further instructed courts to hesitate before recognizing a *Bivens* damages remedy because "creating a cause of action is a legislative endeavor," "the Judiciary's authority" to create a *Bivens* remedy is "at best, uncertain," and if it "were called to decide *Bivens* today, [it] would decline to discover any implied causes of action in the Constitution." *Egbert v. Boule*, 596 U.S. 482, 491, 502 (2022) (citation omitted).  Yet, the Court retained the two-step framework for consideration of a *Bivens* damages remedy.  First, courts must ask whether the case presents "a new *Bivens* context" and, if so, whether there are "'special factors' indicating that the Judiciary is at least arguably less equipped than

---

[13] *Supra* note 6.

Congress to 'weigh the costs and benefits of allowing a damages action to proceed.'"
*Id.* at 492 (emphasis added). The Court advised that "in all but the most unusual
circumstances, prescribing a cause of action is a job for Congress, not the courts[.]"
*Id.* at 486.  "Unless the Supreme Court has recognized the context before, the context
is 'new' and a special factors inquiry is required to determine if *Bivens* expansion is
appropriate."  *Mack v. Yost*, 968 F.3d 311, 319 (3d Cir. 2020).

Under the second step of the analytical framework, "a *Bivens* remedy will not
be available if there are 'special factors counselling hesitation in the absence of
affirmative action by Congress.'" *Abbasi*, 582 U.S. at 136 (quoting *Carlson*, 446 U.S.
at 18 (quoting *Bivens*, 403 U.S. at 396)).  Under this step, courts must consider
"whether the Judiciary is well suited, absent congressional action or instruction, to
consider and weigh the costs and benefits of allowing a damages action to proceed."
*Id.*  The two analytical steps "often resolve to a single question: whether there is any
reason to think that Congress might be better equipped to create a damages remedy."
*Egbert,* 596 U.S. at 482 (emphasis added).  Ultimately, "[i]f there is even a single
reason to pause before applying *Bivens* in a new context, a court may not recognize a
*Bivens* remedy."  *Id.*

### 1.  Whether Plaintiff's Claims Present a New *Bivens* Context?

COVID-19 was unprecedented and placed high demands on correctional and
detention facilities. (Decl. of N. Turner-Foster, Dkt. No. 39-5); (Crisson Decl., Dkt.
No. 39-4); (Declaration of Adam Sassaman, Dkt. No. 39-6).  Therefore, Plaintiff's

Eighth Amendment claim based on Defendants' alleged deliberate indifference to Plaintiff's health by exposing Plaintiff to COVID-19 undeniably presents a new *Bivens* context.  *See Greer v. Caravajal*, No. 5:22-cv-00334-VBF-JDE, 2022 WL 4826513, at *6 (C.D. Cal. June 30, 2022), *report and recommendation adopted sub nom. Greer v. Carvajal*, 2022 WL 4842927 (C.D. Cal. Sept. 30, 2022) (collecting cases).

Plaintiff also alleges an Eighth Amendment claim based on conditions of confinement including overcrowding, lack of sanitation, broken windows, spoiled food, lack of heat and lead pipes.  This claim is meaningly different from the three prior cases where the Supreme Court implied a damages remedy, none of which involved the physical living conditions in a prison.  *See*, *Mammana*, 856 F. App'x at 414-15 (holding an Eighth Amendment conditions-of-confinement claim against federal prison officials presents a new *Bivens* context).

Plaintiff further alleges prison employees were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment by delaying treatment for H. Pylori, shortness of breath, and other unidentified medical conditions during the COVID-19 pandemic.   In *Carlson*, where the Supreme Court recognized a damages remedy, the estate of a deceased federal prisoner brought an Eighth Amendment claim against prison officials who failed to provide any medical treatment for the decedent's asthma, resulting in the death of the inmate.  446 U.S. 14.   "A claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized."  *Hernandez v. Mesa*, 589 U.S. 93, 743 (2020).

Relevant here, Dr. Turner Foster explained:

> In order to minimize the movement of inmates, sick call slips were distributed in the housing units.  Inmate[s] were triaged at the daily Pill-line. … Pill line was conducted while inmates were obtaining their grab and go meal[s]. Pill Line was conducted one unit at a time. …
>
> A Registered Nurse ran sick call Monday through Friday. The Nurse triaged the complaints, and any priority complaints were discussed with the Nurse Practitioner or me, as the Clinical Director at the Facility and assigned physician at the Camp.  All other routine sick call complaints were scheduled for a later date. . . .
>
> The COVID-19 pandemic had a profound impact on medical providers throughout New Jersey, making "routine" medical care more scarce in 2020.  That fact, combined with necessary limitations of movement and BOP quarantine policies, affected the Health Services Department's ability to access outside services in 2020. Accordingly, wait times for non-emergent outside medical services increased for FCI Fort Dix inmates.

(Decl. of N. Turner-Foster, Dkt. No. 39-5 at 4-5.)  Plaintiff's Eighth Amendment claim of inadequate medical care arises in a new *Bivens* context because providing medical care to inmates during COVID-19 was significantly impacted by the need to prioritize limited health care resources.

### 2.   Whether Special Factors Counsel Hesitation in Implying a Damages Remedy?

The Supreme Court has instructed that if "there is any reason to think that Congress might be better equipped to create a damages remedy[,]"in a new *Bivens* context, then courts should not imply a damages remedy.  *Egbert*, 596 U.S. at 492. Defendants have offered multiple reasons why this Court should hesitate to create a

damages remedy for Plaintiff's constitutional claims, including: (1) there are alternative processes capable of protecting the interests at stake; (2) separation-of-powers; (3) congressional action; and (4) the potentially enormous social costs in extending *Bivens* to Eighth Amendment claims. (Defs' Brief, Dkt. No. 39-1 at 51-56.)

Defendants have identified alternate processes that protect inmates' Eighth Amendment interests in humane conditions of confinement and adequate medical care, including the BOP administrative remedy program, 28 C.F.R. § 542.10 *et seq.*; motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A); FTCA damages remedy (where appropriate); and injunctive relief under 28 U.S.C. § 1331. The Supreme Court has stated, "when alternative methods of relief are available, a *Bivens* remedy usually is not." *Abbasi*, 582 U.S. at 145; *see Egbert*, 596 U.S. at 498 ("the ability to submit a grievance through a process created by Congress or the Executive with a sufficient level of deterrence should not be second-guessed by the courts superimposing a *Bivens* remedy"). The ultimate question is whether the court, "rather than the political branches, is better equipped to decide whether existing remedies should be augmented by the creation of a new judicial remedy." *Id.* at 493 (internal quotation marks omitted).

Here, Plaintiff had existing remedies available to obtain injunctive relief, although his claim for injunctive relief became moot when he was released from prison. Plaintiff also had a claim for damages available under the FTCA, assuming that he alleged a plausible constitutional violation and administratively exhausted the

35

claim before bringing suit.  The Supreme Court in *Egbert* explained why this is a

sufficient reason not to extend a *Bivens* damages remedy in a new context:

> the question whether a given remedy is adequate is a
> legislative determination that must be left to Congress, not
> the federal courts. So long as Congress or the Executive
> has created a remedial process that it finds sufficient to
> secure an adequate level of deterrence, the courts cannot
> second-guess that calibration by superimposing a *Bivens*
> remedy. That is true even if a court independently
> concludes that the Government's procedures are "not as
> effective as an individual damages remedy." *Bush* [*v.
> Lucas*], 462 U.S. [367,] 372, 103 S.Ct. 2404 [1983].

*Id*. at 498.

Plaintiff has raised several *Bivens* claims in new contexts under the Eighth

Amendment:  physical condition of the prison; conditions of confinement involving

protection from COVID-19; and inadequate medical care during the COVID-19

pandemic.  "Recognizing any new *Bivens* action, entail[s] substantial social costs,

including the risk that fear of personal monetary liability and harassing litigation will

unduly inhibit officials in the discharge of their duties."  *Id.* at 499 (internal quotation

marks and quotation omitted).  The Supreme Court warned, "[e]ven in a particular

case, a court likely cannot predict the systemwide consequences of recognizing a

cause of action under *Bivens*."  *Id.* at 493 (internal quotation marks and quotation

omitted).  Therefore, special factors counsel hesitation in implying a *Bivens* damages

remedy for Plaintiff's Eighth Amendment claims, and this Court will dismiss the

*Bivens* claims for lack of jurisdiction.

## V.    CONCLUSION

Plaintiff's requests for injunctive relief based on his Eighth Amendment conditions of confinement claims are moot because he has been released from confinement by the Bureau of Prisons.  The Court lacks jurisdiction over Plaintiff's unexhausted FTCA claims, which will be dismissed without prejudice.  The Court lacks jurisdiction over Plaintiff's exhausted FTCA claim under the discretionary function exception, and the claim will be dismissed with prejudice.  Finally, the Court declines to imply a *Bivens* damages remedy for Plaintiff's constitutional claims, and the *Bivens* claims will be dismissed with prejudice for lack of jurisdiction.

An appropriate Order follows.

**DATE:**  <u>June 20, 2024</u>

<u>s/Renée Marie Bumb</u>
RENÉE MARIE BUMB
Chief United States District Judge